**XEROX CORPORATION,
Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–
Appellee.**

No. 93–5094.

United States Court of Appeals,
Federal Circuit.

Dec. 6, 1994.

Rehearing Denied Feb. 7, 1995.

---

H. Stewart Dunn, Jr., Ivins, Phillips and Barker, Washington, DC, argued for plaintiff-appellant. With him on the brief were Michael F. Solomon and Claude B. Stansbury, of counsel.

Thomas J. Clark, Atty., Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Michael L. Paup, Acting Asst. Atty. Gen., Gary R. Allen and David English Carmack, Attys.

Before RICH, NEWMAN, and PLAGER, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

■ This tax appeal has its origins in the United Kingdom system of corporate and shareholder taxation that was adopted in the Finance Act of 1972. The ensuing changes of tax structure in the United Kingdom resulted in renegotiation of the tax treaty between the United Kingdom and the United States, in order to obtain for United States

shareholders the avoidance of double taxation on dividends. This benefit had been made available to United Kingdom shareholders through a method of "imputation," enacted in the 1972 law.

The issue is whether Xerox Corporation is entitled, by virtue of the tax treaty, to an indirect foreign tax credit for tax year 1974 for certain Advance Corporation Tax ("ACT") that was paid in the United Kingdom by its affiliated company Rank Xerox Ltd. ("RXL"), on dividends that RXL paid to Xerox Corporation in 1974.

We conclude that the tax treaty and revenue code allow the tax credit to Xerox for the tax year in which the ACT was paid or accrued in the United Kingdom, whether or not the ACT was offset against mainstream corporation tax in the United Kingdom, or was otherwise used or surrendered by RXL in accordance with United Kingdom law.

## BACKGROUND

Xerox, a New York corporation, owned directly and indirectly the majority of the voting shares of RXL, a corporation of the United Kingdom. RXL had various subsidiary companies in the United Kingdom, including Rank Xerox Management Limited, Rank Xerox U.K. Limited, and Rank Xerox Ireland Limited. In 1974, the tax year here at issue, RXL paid a dividend distribution to Xerox and paid the requisite ACT in the United Kingdom on the distribution.

A portion of that ACT was set off in 1974 against RXL's mainstream corporation tax in the United Kingdom, as permitted by British law; the foreign tax credit for that portion of the 1974 ACT is not in dispute. However, a portion of the ACT was not used to offset RXL's mainstream tax. In 1980 this unused ACT was surrendered by RXL to its United Kingdom subsidiaries, again as permitted by British law. The United States Internal Revenue Service ("IRS") then withdrew the foreign tax credit for this portion of the ACT, credit that had been allowed to Xerox in

1974, and required payment of the corresponding income tax on the dividends received by Xerox in 1974. Xerox paid the tax and brought suit for refund in the Claims Court. Recovery was denied. *Xerox Corp. v. United States,* 14 Cl.Ct. 455 (1988).[1] Final Judgment was entered on Nov. 5, 1992. Xerox states that it has been allowed no foreign tax credit for this ACT, and that the same profits have thereby been taxed twice.

### A. The United Kingdom Finance Act of 1972

The system of corporate taxation that was instituted by the United Kingdom Finance Act of 1972 was designed, *inter alia,* to eliminate double taxation of the same profits, at both the corporate and shareholder levels. This was achieved by "imputation" to resident shareholders of the tax paid by the corporation on distributions to the shareholders. In accordance with the Finance Act of 1972 a United Kingdom corporation must pay 1) mainstream corporation tax, which is a tax on corporate income, and 2) advance corporation tax (ACT), a tax on any qualifying distribution to shareholders. Section 85 of the Finance Act of 1972 provides that ACT payments can be used by a United Kingdom corporation to offset its mainstream corporation tax (the "Section 85 offset"). However, the ACT must be paid by the United Kingdom corporation when the shareholder distribution is made, regardless of the corporation's mainstream tax liability or offset opportunity.

The ACT is payable whether or not the corporation has any profits. ACT is not refundable, whether or not it is used as a Section 85 offset by the United Kingdom corporation that paid the tax.[2] Unused Section 85 offset can be carried back to the two preceding taxable periods or carried forward indefinitely.

Section 92 of the Finance Act of 1972 permits the distributing corporation that paid the ACT to surrender, at any time, all or

---

1. The Claims Court was renamed the Court of Federal Claims in 1992.

2. An exception can occur if the United Kingdom corporation pays ACT and then receives additional franked investment income during the same accounting period. That exception is not relevant to this case.

part of its Section 85 offset to a United Kingdom subsidiary that is 51% or more owned by the distributing corporation. The subsidiary can then use the surrendered offset against its own mainstream corporation tax. The right to carry forward or surrender Section 85 offset to subsidiaries is useful, for example, when the United Kingdom parent corporation has excess foreign tax credits, because those credits must be used in the year they are earned.

Section 86 of the Finance Act of 1972 provides that a United Kingdom resident shareholder is entitled to a tax credit for the ACT paid by the corporation. This is called the "Section 86 credit":

> 86(1) [Entitlement to Credit] Where a company resident in the United Kingdom makes a qualifying distribution after 5th April 1973 and the person receiving the distribution is another such company or a resident in the United Kingdom, not being a company, the recipient of the distribution shall be entitled to a tax credit under this section....
>
> 86(2) [Purpose and amount of tax credit] The tax credit in respect of a distribution shall be available for the purposes specified in the section and the subsequent provisions of this Act, and shall be equal to such proportion of the amount or value of the distribution as corresponds to the rate of advance corporation tax in force for the financial year in which the distribution is made.

In this way double taxation on dividends is alleviated for United Kingdom residents. The Section 86 credit can not be withdrawn or withheld by the United Kingdom tax authorities.

The resident shareholder receives the Section 86 credit when the dividend is received. However, the Finance Act of 1972 excluded non-resident shareholders from this benefit. In a document entitled *Reform of Corporation Tax Presented to the Parliament by the Chancellor of the Exchequer by Command of her Majesty,* April 1972, at p. 11 ¶ 32, it was stated that one of the reasons for denying non-resident shareholders the Section 86 credit was to require tax treaty partners to renegotiate the treaty terms, whereby the British government hoped to obtain balancing concessions.

## B. The Renegotiated Tax Treaty

On enactment of the Finance Act of 1972, the United States requested renegotiation of the existing tax treaty. The purpose was to obtain the benefit of the shareholder tax credit for United States investors who receive dividends from United Kingdom companies, thereby avoiding double taxation of the same profits. *See* S.Exec.Rep. No. 95–18, 95th Cong., 2nd Sess., 22–24, 32–37 (1978), *reprinted in* 1980–1 C.B. 411, 420–21, 426–29; Statement of Assistant Secretary of the Treasury Laurence N. Woodworth, July 19, 1977, before the Senate Foreign Relations Committee, *id.* at 86, 89–90, *reprinted in* 1980–1 C.B. at 433, 435–36.

The renegotiated tax treaty was signed on December 31, 1975, and amended by diplomatic notes on April 13, 1976, First Protocol of August 26, 1976, Second Protocol of March 31, 1977, and Third Protocol of March 15, 1979, together comprising the *Convention Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains,* 31 U.S.T. 5668 (hereinafter the "Treaty"), *reprinted in* 1980–81 C.B. at 394. As was explained to the Senate during the ratification proceedings, Articles 10 and 23 of the Treaty were "designed to resolve the problems presented by the interaction of the U.S. system of corporate taxation and the new hybrid system adopted by the United Kingdom in 1973 [the Finance Act of 1972] which in part integrates corporate and shareholder taxation." S.Exec.Rep. No. 95–18 at 4, *reprinted in* 1980–81 C.B. at 413.

Treaty Article 10 is retroactive only to April 6, 1975, and thus does not apply to the ACT paid on Xerox's 1974 dividends. However, it is a guide to the purpose of the Treaty and the intent of its terms. The relevant portion is:

## Article 10—Dividends

\*        \*        \*        \*        \*        \*

(2)(a) In the case of dividends paid by a corporation which is a resident of the United Kingdom:

(i) to a United States corporation which either alone or together with one or more associated corporations controls, directly or indirectly, at least 10 percent of the voting stock of the corporation which is a resident of the United Kingdom paying the dividend, the United States corporation shall be entitled to a payment from the United Kingdom of a tax credit equal to one half of the tax credit to which an individual resident in the United Kingdom would have been entitled had he received the dividend, subject to the deduction withheld from such payment and according to the laws of the United Kingdom of an amount not exceeding 5 per cent of the aggregate of the amount or value of the dividend and the amount of the tax credit paid to such corporation;

The tax credit in Article 10 is paid to the United States corporate shareholder for the tax period in which the ACT is paid or accrued by the United Kingdom corporation on the dividend distribution; that is, the period in which the United Kingdom shareholder would have received a credit under Section 86. This credit is not defeasible by subsequent events concerning how the United Kingdom corporation uses its Section 85 offset, as the government asserts for the tax credit in Article 23.

Treaty Article 23 is retroactive to April 1, 1973. With only Article 23 in force in 1974, it was agreed that a 1974 tax credit for the ACT paid by RXL in 1974 on the dividends to Xerox, if the credit were held to be available to Xerox, would apply to all the ACT at issue.

## Article 23—Elimination of Double Taxation

23(1) In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principles hereof), the United States shall allow to a resident or national of the United States as a credit against the United States tax the appropriate amount of tax paid to the United Kingdom; and, in the case of a United States corporation owning at least 10 percent of the voting stock of a corporation which is a resident of the United Kingdom from which it receives dividends in any taxable year, the United States shall allow credit for the appropriate amount of tax paid to the United Kingdom by that corporation with respect to the profits out of which such dividends are paid. Such appropriate amount shall be based upon the amount of tax paid to the United Kingdom, but the credit shall not exceed the limitations (for the purpose of limiting the credit to the United States tax on income from sources outside of the United States) provided by United States law for the taxable year. For the purposes of applying the United States credit in relation to tax paid to the United Kingdom:

(a) the taxes referred to in paragraphs (2)(b) and (3) of Article 2 (Taxes Covered) shall be considered to be income taxes;

(b) the amount of 5 or 15 per cent, as the case may be, withheld under paragraph (2)(a)(i) or (ii) of Article 10 (Dividends) from the tax credit paid by the United Kingdom shall be treated as an income tax imposed on the recipient of the dividend; and

(c) that amount of tax credit referred to in paragraph (2)(a)(i) of Article 10 (Dividends) which is not paid to the United States corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend shall be treated as an income tax imposed on the United Kingdom corporation paying the dividend.

Thus for dividends distributed to a United States shareholder corporation, Article 10 provides that half of the ACT paid in the United Kingdom is repaid as a tax credit by the United Kingdom, and Article 23 provides that the remainder is allowed as a United States tax credit as if the ACT were an income tax in the United Kingdom.

The government's position is that the Article 23 tax credit for ACT paid is not available to a United States shareholder corporation until or unless the Section 85 offset has been used in the United Kingdom to offset mainstream corporation tax; that is, that the tax credit provided in Article 23(1)(c) is an interim or provisional credit, which in Xerox's case was withdrawn when RXL surrendered its Section 85 offset to its subsidiaries. The Court of Federal Claims so held.

## DISCUSSION

■ In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. *See United States v. Stuart,* 489 U.S. 353, 365–66, 109 S.Ct. 1183, 1190–91, 103 L.Ed.2d 388 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); *Kolovrat v. Oregon,* 366 U.S. 187, 193–94, 81 S.Ct. 922, 925–26, 6 L.Ed.2d 218 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 185, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982), the court's role is "limited to giving effect to the intent of the Treaty parties." *See generally* Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144–145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. *Valentine v. United States,* 299 U.S. 5, 11, 57 S.Ct. 100, 103, 81 L.Ed. 5 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.")

■ Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. *See Air France v. Saks,* 470 U.S. 392, 400, 105 S.Ct. 1338, 1343, 84 L.Ed.2d 289 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation.") However, "the ultimate question remains what was intended when the language actually employed ... was chosen, imperfect as that language may be." *Great–West Life Assurance Co. v. United States,* 678 F.2d 180, 188, 230 Ct.Cl. 477 (1982). In this context we have reviewed the evidence as well as the arguments proffered by both sides.

### A. The Purpose of the Treaty

■ The stated purpose of the renegotiation, and the stated purpose of Article 23, is the elimination of double taxation of United Kingdom corporate distributions of dividends to United States shareholders. As explained by Paul W. Oosterhuis, an attorney for the Senate Joint Committee on Taxation, "generally favorable tax credit rules is an important concession to the United Kingdom which will make U.S. direct investment in the United Kingdom more attractive." (*quotes in Snap–On Tools, Inc. v. United States,* 26 Cl.Ct. 1045, 1069 (1992), *aff'd,* 26 F.3d 137 (Fed.Cir. 1994) (Table)). It is not disputed that the ACT on the dividends paid by RXL to Xerox in 1974 is subject to Article 23 of the Treaty.

Article 23 provides that "the United States shall allow credit for the appropriate amount of tax paid to the United Kingdom." It was stipulated in the Claims Court that Article 23(1)(c) provides a tax credit to the United States shareholder for ACT paid by the United Kingdom corporation, by treating the ACT as an income tax imposed on the United Kingdom corporation paying the dividend. The government's position, as we have stated, is that the Treaty permits the United States to reverse that tax credit unless or until the ACT is set off against mainstream corporation tax in the United Kingdom.

The Treaty does not mention such a condition on the allowance of foreign tax credit in the United States for ACT paid in the United Kingdom. Xerox argues that this omission is strong evidence that this restrictive condition was not intended by the signatories, for so dramatic a change in the effect of the Trea-

ty—in this case defeating the purpose of avoiding double taxation on profits—should not be inferred by silence. Xerox argues that if the downstream disposition of the Section 85 offset were controlling of the availability of the benefit for which the Treaty was renegotiated, the Treaty could not have omitted stating this condition explicitly. Xerox states that the plain meaning of the Treaty, in the context of its purpose, does not permit its interpretation to require this modification.

Article 10 is relevant to understanding the plain meaning of the Treaty, as we have mentioned, because its provision, whereby the United Kingdom pays half of the tax credit for the ACT directly to the United States shareholder, is not dependent on whether or when the United Kingdom corporation or its United Kingdom subsidiaries uses the Section 85 offset against mainstream corporation tax. Indeed, no such dependency has been suggested by the government for Article 10.

United Kingdom shareholders receive the ACT credit whether or not the ACT offset is used, surrendered, or saved by the British payor of the dividend. Stipulated Fact 30 in the Claims Court record is that a United Kingdom shareholder "is entitled to the benefit of the U.K. shareholder credit in respect to the period in which the qualifying distribution is made," without regard to whether or how the U.K. company uses the ACT "in that accounting period or in any other accounting period." This weighs against the government's argument that the Article 23 credit must be interpreted as not available to the United States shareholder until the occurrence of some subsequent event in the United Kingdom.

The government states that the United States always intended to restrict the availability of the ACT credit to United States taxpayers on the basis here asserted, and that this position was known to and was accepted by both signatories. In support, the government relies on the Treasury's Technical Explanation issued in 1977 and Revenue Procedure 80–18, documents we shall discuss *post*. In opposition, Xerox relies on the plain language of the treaty itself,

its ratification history, and testimony of the chief negotiators for the United States and the United Kingdom. The 1986 Competent Authority Agreement is relevant, as are the provisions of the United States tax code with respect to foreign tax credits.

## B. The Negotiation History

The Senate Report that accompanied the Treaty when it was presented for ratification in 1978 stated that "the United States agrees that it will continue to allow its U.S. citizens and residents to claim … the indirect foreign tax credit (Code sec. 902)." S.Exec. Rep. No. 95–18 at 32, *reprinted in* 1980–81 C.B. at 426. The Report explained that a reason for renegotiation of the existing treaty was to ensure that the ACT would be credited by the IRS:

> There is, therefore, a reasonable possibility that the ACT would not be viewed by the IRS as a creditable tax in the absence of the proposed treaty.

S.Exec.Rep. No. 95–18 at 34, *reprinted in* 1980–81 C.B. at 427. The Report explained that in the absence of the new treaty provisions, the ACT that was paid by the foreign corporation might not be creditable to the United States taxpayer until some later year in which United Kingdom mainstream tax liability was offset by the ACT:

> However, notwithstanding these technical difficulties [that ACT did not fit the IRS criteria for a creditable foreign tax], the ACT could be treated as a creditable income tax to the extent that it is allowed as an offset against the U.K. "mainstream" corporate tax, which is a creditable income tax. Under this treatment, in situations where the ACT is offset against a mainstream tax accruing in years subsequent to the dividend payment, no foreign tax credit would be allowed in the absence of the treaty until that later year in which the mainstream liability is offset.

S.Exec.Rep. No. 95–18 at 34, *reprinted in* 1980–81 C.B. at 427. Thus the position here taken by the government against Xerox was foreseen as occurring "in the absence of the proposed treaty," *id.*, and its remedy was a stated purpose of the Treaty.

Affidavits of negotiators for both sides were in accord with each other and with this purpose. Robert J. Patrick, Jr., International Tax Counsel for the Treasury and a principal negotiator for the United States, averred that the assumption during the negotiations was that under the Treaty "the U.S. foreign tax credit [for ACT paid to the U.K.] resulted in the resulting U.S. tax credits going to the U.S. corporate shareholders in the year the dividend was paid, rather than revenues going to the U.S. Treasury." He and David S. Foster of the Treasury, who succeeded Patrick as International Tax Counsel, and Paul W. Oosterhuis of the Senate Joint Committee on Taxation, averred that Article 23 was not viewed during the negotiations as providing a "provisional" or "interim" credit for ACT: the theory on which the IRS withdrew, in 1980, the ACT credit it had allowed in 1974. Mr. Patrick averred that "[t]o the best of my knowledge, this interpretation of the Treaty has never previously been set forth by the United States, the United Kingdom, or anyone else." Mr. Oosterhuis averred that "[t]o the best of my recollection, the Treasury Department never presented to the Senate in its ratification procedure any explanation that the ACT is creditable under Article 23(1)(a) or that the credit for ACT under Article 23(1)(c) is an interim credit."

These statements are consistent with the clear text of the treaty and its purpose of avoiding double taxation of dividends. A provisional or interim credit, defeasible by actions of the distributing corporation six years later inside the United Kingdom, is in bold conflict with that plain meaning.

The negotiators for the United Kingdom testified to similar effect, and responded to the government's statements in the Claims Court that they had accepted the proposed interpretation. Lord Rees, the responsible Minister of the United Kingdom Government for this Treaty and the Minister of State at the British Treasury from 1979 to 1981, averred:

As I stated in comments delivered to the House of Commons in January 1977 and again on 18th February 1980, a fair balance had to be struck between United States and United Kingdom portfolio and direct investors.... Developing a fair balance for the United States direct investor was more difficult but was eventually accomplished by the United Kingdom giving an immediate 50 percent refund (subject to a 5 percent withholding tax which was currently creditable against United States tax liability) and the United States giving an indirect foreign tax credit for the other 50 percent under Article 23(1)(c). *To strike the intended fair balance with United Kingdom shareholders, this indirect foreign tax credit had to be currently creditable. Therefore, to the extent that the United States Treasury Technical Explanation denies a current indirect foreign tax credit, it frustrates the policy underlying these provisions of the Treaty.* Consequently, had the United States Government interpretation of Article 23(1) been brought to my attention as the responsible Minister of the United Kingdom Government, *I would have raised objections to its interpretation* of the Treaty as being in conflict with the policy underlying the Treaty.

(Emphases added, citations to exhibits omitted.) The affidavit of the Rt. Hon. Denzil Davies, Minister of State at the Treasury from 1975 to 1979, was to the same effect, and equally strongly stated.

■■■ The government argues that there is "no reason to give any weight" to affidavits that were drafted after the Treaty entered into force. It is correct that *post facto* statements of legislators interpreting a statute are usually not accorded much weight, see *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 116–18 & n. 13, 100 S.Ct. 2051, 2060–61 & n. 13, 64 L.Ed.2d 766 (1980), for it is seldom easy to reconstruct all of the legislative interests. Similar reasoning well applies to treaties. However, one need not ignore the identity and statute of the affiants, or the nature of their involvement, particularly when the affiants simply but strongly reinforce the plain meaning of the text of the treaty. When the recollections of the persons principally involved are fully consistent with the clear text of the treaty, and when no substantial contrary evidence has been proffered, these affi-

davits add weight to the wisdom expressed in *Rocca v. Thompson*, 223 U.S. 317, 332, 32 S.Ct. 207, 210, 56 L.Ed. 453 (1912), that had the signatories intended the purpose now urged, "it would have been very easy to have declared that purpose in unmistakable terms."

### C. The Technical Explanation

In 1977, in connection with the Senate ratification proceedings, the Treasury issued a Technical Explanation that stated, *inter alia*, that the United States foreign tax credit for ACT depended on when the ACT was used to offset mainstream tax in the United Kingdom, and that any credit previously given would be reduced accordingly:

1. ACT paid with respect to a distribution shall be treated as attributable to the accumulated profits (determined under U.S. principles) of the year of distribution, *except* in two circumstances:

a) to the extent the ACT reduces mainstream tax for a prior or subsequent year; and

b) if, after attribution of ACT which does not reduce mainstream tax, accumulated profits would not exceed corporate taxes for the year.

ACT which reduces mainstream tax in any year or years shall be attributable to any accumulated profits of the year or years for which the mainstream tax is reduced. Where ACT is used to offset mainstream tax, the offset will be viewed as a refund of the ACT initially allowed as a credit and as a tax paid in respect of the year for which the ACT is applied as an offset. Consequently, a reduction in the foreign tax credit for the year from which the ACT is carried must be made in accordance with section 905(c) of the Code. . . .

*Technical Explanation of the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains Signed at London, on December 31, 1975, as Amended by the Notes Exchanged at London on April 13, 1976, the Protocol Signed at London on August 26, 1976, and the Second Protocol signed at London on March 31, 1977* (herein "Technical Explanation"), submitted to the Senate Foreign Relations Committee at hearings held on July 19–20, 1977, *reprinted in* 1980–81 C.B. at 473–74.

This approach was referred to and criticized in general terms in the Senate Executive Report, as quoted *supra.* Referring specifically to the Technical Explanation, the Report mentioned the "difficult and complex issues" raised, and declined to "adopt or reject" the "amplifications" in the Technical Explanation:

The Treasury's technical explanation also set forth a complex set of rules and examples intended to be used for purposes of determining the earnings to which ACT payments by a U.K. corporation are to be attributed for purposes of computing the indirect foreign tax credit. . . .

The ACT refunds, the withholding tax, and the unrefunded portion of the ACT are treated for U.S. foreign tax credit purposes in a manner which is generally favorable to U.S. shareholders. These rules raise difficult and complex issues. In recommending the ratification of the proposed treaty, the Committee does not intend that these rules necessarily serve as a model for future treaties. Further, in recommending the ratification of the treaty, the Committee does not intend to adopt or reject the amplifications of the foreign tax credit rules contained in the Treasury technical explanation. Consequently, Treasury would not be foreclosed by the ratification of the treaty from modifying those administrative interpretations in the future should it deem it advisable to do so. Of course, the rules contained in the treaty also do not limit any legislative action in this area; the computation of the foreign tax credit for unrefunded ACT may be subject to any generally applicable changes in the U.S. foreign tax credit rules which may subsequently be enacted.

S.Exec.Rep. No. 95–18 at 36–37, *reprinted in* 1980–81 C.B. at 429. One may debate the meaning of this cool treatment of the Technical Explanation. What is clear, however, is

that the Treasury's position was not embraced by the Senate. That this position is absent from the text of the Treaty is not surprising for, as the negotiators and the Senate recognized, it defeats the stated purpose of avoiding double taxation of the same profits.

■ A treaty must be construed in accordance with the intent of both signatories. Both of the United Kingdom's Ministers for the Treasury averred that they did not accept, or even know of, the position taken in the Technical Explanation:

> I can say categorically that I was not at any time as Minister or as a Member of the House of Commons shown the Technical Explanation, or briefed on the Technical Explanation or the point at issue in the case. Since I was the responsible Government Minister speaking for the Government in the debates before the House of Commons, I would be the only person to bring any such material before the House of Commons or authorize it to be deposited in the library of the House of Commons.
>
> \* \* \* \* \* \*
>
> [T]he United Kingdom Government did not accept this United States Treasury Technical Explanation of Article 23 either explicitly or implicitly.
>
> \* \* \* \* \* \*
>
> [W]hen the House of Commons approved the Order in Council giving effect to the Treaty as a matter of U.K. domestic law in February 1980, neither it nor I as the Minister responsible had any knowledge, express or implied, of the Technical Explanation. In these circumstances, it is not surprising that the United Kingdom voiced no objection to the Technical Explanation.

Affidavit of Lord Rees at 5–8. The Rt. Hon. Denzil Davies averred:

> I can state from my own knowledge that during the whole of the period when I was a Minister of State responsible for the Treaty, I had no knowledge of and never saw the United States Treasury Technical Explanation of the Treaty in any form.
>
> \* \* \* \* \* \*

> [T]he United Kingdom Government of which I was a member and on whose behalf I was the responsible Minister in this matter did not accept the United States Treasury's Technical Explanation either explicitly or implicitly.

Affidavit of Rt. Hon. Denzil Davies at 5–6.

The government refers to the affidavit of a Treasury employee and member of the United States negotiating team, Steven P. Hannes, who stated that "copies of the Technical Explanation would have been sent to the U.K. negotiators." No evidence of such "sending" was provided, and it must be assumed that the Treasury's files contained no such support. On this extremely one-sided record, it would violate any reasonable canon of construction to infer mutual assent by the signatories to the position taken by the Treasury.

### D. The Revenue Procedure

On the effective date, after the Treaty was ratified by both signatories, the Treasury issued Revenue Procedure 80–18, which introduced a different theory on which to deny the Article 23 credit for ACT, depending on whether the United Kingdom corporation surrendered the Section 85 offset to subsidiaries in the United Kingdom:

> [F]or U.S. foreign tax credit purposes and pursuant to Article 23, the parent corporation has not paid or accrued the unrefunded ACT [Section 85] offset against the subsidiary's mainstream tax and has contributed to the capital of the subsidiary an amount equal to the unrefunded ACT offset.

Rev.Proc. 80–18, § 3.05, *reprinted in* 1980–1 C.B. at 625. That is, if the British corporation that paid the ACT later surrenders the Section 85 offset to its subsidiaries, Revenue Procedure 80–18 treats that surrender as a contribution to the capital of the subsidiary, and reverses the tax credit previously granted pursuant to Article 23(1)(c). Thereafter, the government argues, ACT is creditable only under Article 23(1)(a). As we shall discuss, this interpretation strains the plain meaning of the treaty. It would also defeat the Treaty purpose of avoiding double taxation.

Revenue Procedures "do not have the force and effect of Treasury Department Regulations." 1980–81 C.B. at v. *See Helvering v. New York Trust Co.,* 292 U.S. 455, 468, 54 S.Ct. 806, 810, 78 L.Ed. 1361 (1934) (revenue rulings cited by the Commissioner "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of law"); *Spang Industries, Inc. v. United States,* 791 F.2d 906, 913 (Fed.Cir.1986) ("a revenue ruling is entitled to some weight as reflecting the Commissioner's interpretation of the regulation, but does not have the same force as a regulation"); *State Bank of Albany v. United States,* 530 F.2d 1379, 1382, 209 Ct.Cl. 13 (1976) ("It may be helpful in interpreting a statute, but it is not binding on ... the courts.") Thus although the Revenue Procedure warrants fair consideration as reflecting the Treasury's position, it is not insulated from inquiry.

▉ The new theory offered in Procedure 80–18 leads to the faulty conclusion that Xerox's credit for the ACT that was paid by RXL on the dividends received by Xerox can be rescinded based on downstream activity within the United Kingdom. The internal disposition of ACT in any of the ways authorized by the Finance Act of 1972 is not relevant to the Section 23 credit. A foreign country's internal procedures do not determine United States tax credit rules, other than as encompassed within a Treaty. *United States v. Goodyear Tire & Rubber Co.,* 493 U.S. 132, 110 S.Ct. 462, 107 L.Ed.2d 449 (1989). A Revenue Procedure can not change the terms and purpose of a treaty. Procedure 80–18,[3] insofar as it would reverse Xerox's entitlement to the Article 23 credit for the ACT that was paid by RXL on the dividends paid to Xerox, is declared void.

### E. The Competent Authority Agreement

▉ A dispute, ambiguity, or uncertainty concerning a treaty is ideally resolved by the signatories themselves. Such a process can provide useful clarification, short of substantive change which would require ratification.

The Treaty's Article 25 provides for such a "Mutual Agreement Procedure." This procedure was invoked in 1986 at the initiative of the United States with the approval of the Claims Court, while this case was pending.

After a period of discussion, an agreed letter from the United States Competent Authority (by delegation of the Secretary of the Treasury, the Competent Authority was the Associate Commissioner (Operations) of the Internal Revenue Service), to the United Kingdom Competent Authority, was issued on December 18, 1986 and accepted on December 23, 1986. The Agreement states, in substantial part:

1. It is agreed that Article 23(1)(c) provides a mechanism by which a U.S. foreign tax credit may be obtained for that part of the U.K. tax credit referred to in Article 10(2)(a)(i) which is not paid to a U.S. corporation but to which an individual resident in the United Kingdom would have been entitled had he received the dividend.

2. It is agreed that Article 23(1)(c) was included in the Convention for the purpose of ensuring that in accordance with Article 23(1)(a) the Advance Corporation Tax ("ACT") payment which generally underlies the U.K. tax credit referred to in paragraph 1 would be treated as an income tax paid to the United Kingdom by the U.K. corporation paying the dividend, because the United States questioned to what extent, in the absence of the Convention, payments of ACT would be treated as payments of a creditable corporate income tax for U.S. foreign tax credit purposes.

3. It is agreed that, pursuant to Article 23(1), the Article 23(1)(c) mechanism must be applied in accordance with the provisions and subject to the limitations of the law of the United States and that a credit is to be given under Article 23(1)(c) only for the appropriate amount of tax paid to the United Kingdom.

4. It is agreed that Article 23(1) of the convention was not intended to provide two U.S. foreign tax credits for a single pay-

---

**3.** Another aspect of Revenue Procedure 80–18 was rejected by the Court of Claims in *Brown & Williamson, Ltd. v. United States,* 688 F.2d 747, 752, 231 Ct.Cl. 413 (1982). A still different as-

pect was voided by the Claims Court in *Snap–On Tools v. United States,* 26 ·Cl.Ct. 1045, 1065 (1992), *aff'd,* 26 F.3d 137 (Fed.Cir.1994) (Table).

ment of ACT to the United Kingdom or U.S. foreign tax credits in excess of the amount of corporation tax (including both ACT and mainstream corporation tax) paid to the United Kingdom in respect of the profits out which a dividend is paid.

5. It is agreed that under the language of Article 23(1) which provides that the Article 23(1)(c) credit must be allowed in accordance with the provisions and subject to the limitations of the law of the United States, the timing of the credit is to be determined as a matter of U.S. law.

We discern no substantive change from the Treaty provisions. The Agreement summarizes the Treaty purpose and its implementation as applied to the ACT, deplores the taking of double credit in the United States, and confirms that United States law applies to the timing of the credit. Xerox points out that this Agreement did not treat the important aspects of the Treasury's litigation position, such as that the Article 23 credit is only provisional, or that downstream surrender of the Section 85 offset in the United Kingdom permits or requires revocation of the Article 23 credit.

The Treasury states that paragraph 5 of the Agreement is important because it provides that United States law determines the timing of the credit, and that Revenue Procedure 80–18 "elaborates" United States law and thus controls this case. As we have discussed *supra*, a Revenue Procedure is neither law nor regulation, and is not binding on the courts. The Competent Authority Agreement is silent on the Section 85 offset and the effect of when and how that offset is used in the United Kingdom. This was the main issue in dispute, then and now. The omission from the Agreement of the positions taken in this Revenue Procedure and the earlier Technical Explanation appears to us to emphasize the weaknesses in the government's argument.

The Agreement's affirmation that the timing of the tax credit is governed by United States law directs us to the Internal Revenue Code. As we next discuss, the Code allows the United States taxpayer an indirect foreign tax credit for, *inter alia*, income taxes paid by the foreign corporation on dividends

to the United States shareholder, the credit to be taken when the foreign tax is paid or accrued.

Finally, there is no issue here of double tax credit in the United States. Although the government devotes a significant portion of its brief to this spectre, it is undisputed that this taxpayer has not received single tax credit, and has made no claim that is suspect on this ground.

### F. The Internal Revenue Code Provisions

■ A treaty, when ratified, supersedes prior domestic law to the contrary, *United States v. Lee Yen Tai*, 185 U.S. 213, 220–22, 22 S.Ct. 629, 632–33, 46 L.Ed. 878 (1902), and is equivalent to an act of Congress. However, tacit abrogation of prior law will not be presumed and, unless it is impossible to do so, treaty and law must stand together in harmony. In this case there is easy harmony between the Treaty and the United States law governing foreign tax credits, §§ 901–906 of the Internal Revenue Code of 1954.

■ In construing the tax law, as for any statute, the starting point is the words of the statute, *Bread Political Action Committee v. Federal Election Commission*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982), taking the words in their ordinary meaning in the field of interest, *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979), and giving full effect to "every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). As a special rule in tax cases, "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." *Hassett v. Welch*, 303 U.S. 303, 314, 58 S.Ct. 559, 565, 82 L.Ed. 858 (1938); *Auto–Ordnance Corp. v. United States*, 822 F.2d 1566, 1571 (Fed.Cir.1987).

### 26 U.S.C. § 902

Revenue Code § 902 authorizes, *inter alia*, a tax credit under 26 U.S.C. § 901 for income taxes paid to a foreign government when a domestic corporation owns at least 10 percent of the voting stock of a foreign corporation from which it receives dividends in any

taxable year. The Treaty, by defining ACT as an income tax, brought ACT within the purview of § 902. In accordance with § 902(a), the domestic corporation shall "be deemed to have paid the same proportion of any income ... taxes paid or deemed to be paid by such foreign corporation to any foreign country ... on or with respect to such accumulated profits." Section 902 also includes provisions relating to second and third tier foreign corporations that pay dividends through their parent corporation to the United States corporation.

Each party states that § 902 supports its position. The government states that since § 902 permits a tax credit involving second tier foreign corporations, credit for the ACT paid by RXL in 1974 was properly reversed when RXL surrendered the Section 85 offset to its subsidiaries. The government's position is that credit for this ACT can not be allowed to Xerox until "each foreign subsidiary up the line distributes dividends to its parent."

We do not share this reasoning. The ACT here at issue was for dividends that were paid to Xerox in 1974; the ACT on those dividends was paid by RXL in the United Kingdom in 1974, and was not refundable or reversible. The second-tier RXL subsidiaries did not pay, and had no obligation to pay, the ACT on those dividends. The ACT obligation by RXL was completed in 1974, and was not defeasible by whether, when, or how RXL used its offset rights under United Kingdom law, including whether and when the offset was surrendered to RXL's subsidiaries in the United Kingdom.

In accordance with §§ 901 and 902, Xerox was entitled to the credit when the dividends were distributed to Xerox and the ACT thereon was paid or accrued by RXL, see § 905. The straightforward reading of the Code provisions firmly links the foreign tax credit to the payment to the United States shareholder of dividends on which foreign income tax was paid. In *United States v. Goodyear* the Court reaffirmed that under § 902 the dividends received by the United States parent must be sourced to the year in which the foreign subsidiary paid the foreign tax, citing "§ 902's statutory goal of avoiding

double taxation." *Goodyear,* 493 U.S. at 144, 110 S.Ct. at 470. That principle is not served by the government's theory.

In view of our conclusion that the conditions now imposed on ACT credits have no support in § 902 and are contrary thereto, we do not reach Xerox's alternative argument that in accordance with § 902 Xerox is entitled to the tax credit even without recourse to the Treaty.

## 26 U.S.C. § 905

The government also relies on Code Section 905, which relates to adjustments to and accounting periods for indirect foreign tax credits. Section 905(a) allows the foreign tax credit to be taken in the year in which the foreign tax accrues, and requires consistency in accounting:

**§ 905(a) Year in which credit taken.**

The credits provided in this subpart may, at the option of the taxpayer and irrespective of the method of accounting employed in keeping his books, be taken in the year in which the taxes of the foreign country or the possession of the United States accrued, subject, however, to the conditions prescribed in subsection (c). If the taxpayer elects to take such credits in the year in which the taxes of the foreign country or the possession of the United States accrued, the credits for all subsequent years shall be taken on the same basis, and no portion of any such taxes shall be allowed as a deduction in the same or any succeeding year.

Section 905(c) does not determine entitlement, but authorizes recalculation of the tax credit if the amount of foreign tax is refunded or adjusted after the credit is taken.

**§ 905(c) Adjustments on payment of accrued taxes.**

If accrued taxes when paid differ from the amounts claimed as credits by the taxpayer, or if any tax paid is refunded in whole or in part, the taxpayer shall notify the Secretary or his delegate, who shall redetermine the amount of tax for the year or years affected. The amount of tax due on such redetermination, if any, shall be [paid or credited].... In such redetermi-

nation by the Secretary or his delegate of the amount of tax due from the taxpayer for the year or years affected by a refund, the amount of the taxes refunded for which credit has been allowed under this section shall be reduced by the amount of any tax described in section 901 imposed by the foreign country or possession of the United States with respect to such refund; but no credit under this subpart, and no deduction under section 164 (relating to deduction for taxes) shall be allowed for any taxable year with respect to such tax imposed on the refund....

The Court of Federal Claims erred in its reliance on § 905(c) as substantive basis for the withdrawal of credit upon the 1980 surrender by RXL of the Section 85 offset. Section 905(c) indeed permits redetermination of the foreign tax credit when any foreign tax is refunded or adjusted. However, the ACT paid in 1974 was not refunded or adjusted in 1980. The movement of the Section 85 offset from British parent to subsidiary is not a refund or adjustment of the ACT. This tax obligation in the United Kingdom was fixed and paid in 1974, when the dividends were paid to Xerox. It is not refundable, and no adjustment of the 1974 United States tax credit is warranted. Neither § 902 nor § 905 supports the reversal or postponement of credit for the ACT paid by RXL in 1974.

## CONCLUSION

Review of the evidence and arguments persuades us that the Treaty's meaning on this issue is plain and unambiguous, and that it should not be construed contrary to its clear purpose of avoidance of double taxation. It is inappropriate for courts to depart from the purpose and import of a treaty, "particu-larly [when] there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *Maximov v. United States,* 373 U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184 (1963).

The ACT is a separate tax, and is not properly viewed as a prepayment or interim credit or estimated tax of mainstream corporate tax. The ACT does not become provisional by virtue of the offset procedures available under United Kingdom law. The Treaty requires that the unrepaid (under Article 10) portion of the ACT be "treated as an income tax," Article 23(c), thus accommodating §§ 901 *et seq.* of the Revenue Code.

We conclude that the ACT is creditable in the United States, in accordance with § 902, in the year it is paid or accrued in the United Kingdom. RXL's subsequent disposition of its offset rights under the Finance Act of 1972 did not defeat the foreign tax credit for ACT, which vested in Xerox when the tax and dividends were paid.

The decision of the Court of Federal Claims is reversed. Payment of the claimed refund is ordered, calculated in accordance with law.

## COSTS

Costs in favor of Xerox.

*REVERSED.*