**HOLMES LIMESTONE COMPANY,**
**et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Nos. 5:93 CV 1622; 5:93 CV 1623; 5:93**
**CV 1624 and 5:93 CV 1625.**

United States District Court,
N.D. Ohio,
Eastern Division.

Nov. 13, 1996.

Mark J. Skakun, III, David J. Lewis, David L. Drechsler, Buckingham, Doolittle & Burroughs, Akron, OH, for Holmes Limestone Company.

Stephen A. Sherman, Department of Justice, Washington, DC, James L. Bickett, Office of the U.S. Attorney, Akron, OH, George P. Eliopoulos, Department of Justice, Tax Division, Washington, DC, for defendant.

## MEMORANDUM AND OPINION

SAM H. BELL, District Judge.

The instant matter consists of several consolidated causes brought for refund of overpaid coal excise taxes paid by the various Plaintiffs (Holmes Limestone Company, Rodco, Inc., G & M Mineral Company, and L & M Mineral Company) pursuant to 26 U.S.C.

Section 4121, and one cause brought to challenge the appropriateness of a fraud penalty assessed against Plaintiff Rodco pursuant to 26 U.S.C. Section 6653(b). All Plaintiffs are corporations which do business in the same industry and in the same general area of Ohio; all are primarily owned and controlled by the same group of people. The questions of law and fact are virtually identical from one Plaintiff to the next.

Each of the legal and factual disputes relate in some way to the application of 26 U.S.C. Section 4121. As each party has acknowledged, the reason for the enactment of this tax provision was to provide a friend for the treatment and reparation of those coal miners who, due to their time spent in the mines breathing coal dust, developed pneumonoconiosis, more commonly known as Black Lung Disease. Because lignite, a lesser rank of coal, does not cause Black Lung Disease Congress specifically exempted the mining of lignite from the excise tax. No other coal products or impurities were specifically excluded.

Now, the Plaintiff companies and the Government request this court to decide their dispute over the composition of the product "coal." The Plaintiffs sell a commercial product known as Run of Mine (ROM) coal which includes what Plaintiffs refer to as "pure coal" as well as impurities which they consider to be non-coal materials and thus nontaxable. The Government believes the ROM coal product, impurities and all, is "coal" and therefore subject to the tax. A description of the mining process should help to clarify this disagreement.

The Plaintiff coal companies are small strip miners. They mine coal seams which are buried at a relatively shallow depth, which lie horizontal to the surface of the earth and which average about thirty inches thick. The seams are not necessarily consistent in their size, however, and contain many bends, dips, and undulations. Neither are seams consistent in their content; in addition to "pure coal" seams contain mineral partings, as well as other in-seam shales, sulphur, and moisture.

A front-end loader operator removes the ROM coal from the ground. In doing so, he or she attempts to remove as much of the "pure coal" as possible and as few of the impurities. If the operator notices a significant mineral parting, he or she will dispose of it rather than load it onto the truck with the ROM coal. Nevertheless, mining by means of the front-end loader is an imperfect operation, resulting in the inclusion in the ROM coal of some in-seam impurities as well as a very small portion of the overburden (material such as dirt or rocks on top of the seam) and the underclay. Consequently, ROM coal contains substantial impurities— about 25% by the Plaintiffs' estimate.

One of two things is done next to this ROM coal product: either it is taken to a washing plant where it is crushed and cleansed so as to remove a substantial portion of the impurities, or it is sold as is, in its raw, unwashed condition. These Plaintiffs are small coal producers [1] who sell the vast majority of their coal as ROM coal.

1. The Plaintiffs seek to portray themselves as small companies who are taking on the Government and its unfair preference for larger companies. Because larger coal companies typically wash their coal and because the coal excise tax is determined at the point of sale, the larger coal companies pay excise tax solely on the purer coal. The smaller, ROM-producing companies pay the excise tax on a product with a greater level of impurities, thus, the smaller companies pay a greater amount of tax on an equal amount of "pure coal."

This inequity is not a recent discovery. It was acknowledged earlier in the notice of final rulemaking of 26 C.F.R. § 48.4121–1, a regulation which implements the Black Lung Excise Tax. See 45 Fed.Reg. 66452. The agency stated:

The final issue raised at the hearing and in the comments was the inequity that arises when the small mining company sells raw coal to a cleaning plant and must pay the tax based upon its uncleaned weight. After carefully considering this problem, the proposed regulation has not been revised because under section 4121, the tax is imposed on the first sale of coal, not upon the first sale after the coal has been cleaned.

Id. Thus, the inequity which the Plaintiffs claim is both acknowledged and real. Whether that inequity is improper or unallowable is a question aside and apart from the issues discussed in this opinion.

Currently, the IRS applies the Black Lung excise tax to the total weight of the ROM coal sold (less the weight of any excess moisture) including all impurities. Plaintiffs, however, believe that the product taxable as "coal" is simply that—"pure coal" plus inherent non-coal materials including in-seam shales and inherent moisture. According to Plaintiffs, all other materials found in unwashed or Run of Mine (ROM) coal are not included as "coal" and are not to be taxed by Section 4121.

This case arose because Plaintiffs (with the exception of Rodco) paid excise taxes based on their narrower definition of coal. The Internal Revenue Service, adhering to its broader concept of "coal," found a deficiency in Plaintiffs' tax returns and assessed additional coal excise taxes, which all Plaintiffs paid. The Plaintiffs then filed the instant actions for refunds of the additional assessments which they believe are actually overpayments.

The Defendant United States also argues that Plaintiffs are not entitled to a refund because Plaintiffs did not assume the cost of the excise taxes for which they now seek a refund, but instead they passed the cost of the excise tax along to their customers. Plaintiffs disagree. The parties offer inconsistent views and evidence on this question.

Finally, the IRS has assessed Plaintiff Rodco for civil fraud penalties for Rodco's alleged intentional failure to file the quarterly excise tax return and for its failure to pay any excise taxes during the period of March 31, 1979, through June 30, 1984. Rodco alleges that failure to pay the tax came about as a result of oversight and mistake. The United States disagrees, arguing that Rodco's directors are the same directors who controlled the other corporate Plaintiffs which properly filed and paid (at least a portion of) the excise taxes during the disputed period. The United States contends that Rodco was aware of its duty to pay the tax and intentionally declined to do so.

In an Order entered November 29, 1995, this court denied the motions of all parties requesting summary judgment, in part because there remained genuine questions of material fact, and in part because the court believed that justice would benefit from a more thorough discussion of the issues at trial. A bench trial enduring nearly seven days has since been held, at which the court heard argument and testimony and took other evidence regarding four general issues: whether Plaintiffs have standing to assert their claim for refund of the allegedly overpaid excise taxes; whether the excise tax on Run of Mine (ROM), unwashed coal is to be calculated on the gross weight of the ROM coal, or rather only on that percentage of ROM coal which is "pure coal;" what percentage of the gross weight of the Plaintiffs' ROM coal sales was "pure coal" and what percentage was impurities; and finally, whether Plaintiff Rodco fraudulently failed to file excise tax returns for 18 quarters, from March 31, 1979, through June 30, 1984. These issues have been thoroughly addressed by the parties and the court is now well equipped to set forth its findings of fact and conclusions of law.

## Inclusion of the Tax in the Price of the Coal

■ In order for Plaintiffs to recover any overpaid excise taxes, they must first satisfy 26 U.S.C. 6416(a)(1) which provides in pertinent part:

(1) **General Rule.** No credit or refund of any overpayment of tax imposed by ... chapter 32 (manufacturers taxes) shall be allowed or made unless the person who paid the tax establishes, under regulations prescribed by the Secretary, that he—

(A) has not included the tax in the price of the article with respect to which it was imposed and has not collected the amount of the tax from the person who purchased such article;

26 U.S.C. 6416(a)(1). Although the plain language of this statute and the regulations interpreting the statute does not suggest a heightened burden of proof, some courts have implied that a plaintiff must show that he absorbed the tax by "clear and decisive evidence." *See Andrew Jergens Co. v. Conner*, 125 F.2d 686, 689, 690 (6th Cir.1942) (stating that "under the circumstances here present, very clear and decisive evidence was required," and that plaintiff's proof was "far

from being of that clear and satisfactory character" which would establish standing); *Air Lift Co., Inc. v. United States,* 286 F.Supp. 249, 254 (W.D.Mich., S.D.1968) (relying on *Jergens* for "clear and decisive" standard); *Riviera Mfg. Co. v. United States,* 307 F.Supp. 916, 917 (D.Colo.1969), *aff'd,* 440 F.2d 780 (10th Cir.1971). More recent decisions by other courts have held that a plaintiff must only prove that it absorbed the tax by a preponderance of the evidence. *See Tenneco, Inc. v. United States,* 17 Cl.Ct. 345, 350 (1989); *Anderson Co. v. United States,* 447 F.2d 41, 47 (7th Cir.1971) (requiring Plaintiff to provide only prima facie evidence). While the court finds the arguments supporting the preponderance standard more convincing, in the instant case it makes no difference which of the two standards is more appropriate, as the Plaintiffs have presented evidence sufficient to satisfy both.

■ The United States Claims Court has set forth a useful framework for determining whether a plaintiff has absorbed the cost of an excise tax and is thus eligible for a refund pursuant to Section 6416(a)(1)(A), or whether the plaintiff has instead passed through the cost of the excise tax to its customers. *See Tenneco, Inc. v. United States,* 17 Cl.Ct. 345 (1989), *aff'd,* 899 F.2d 1227 (table), 1990 WL 20805 (Fed.Cir.1990). First, a court should ask whether the plaintiff used cost-based or competitive pricing. *Id.* at 350. Cost-based pricing is also known as cost-plus pricing because under this pricing method the business determines the sales price of its goods by totaling its manufacturing costs, and then adding a reasonable profit. When a manufacturer uses cost-plus pricing, "the court must ascertain if excise taxes are one of the cost components of the final price." *Id.* (citing *Clauson Mfg. Co. v. United States,* 74–2 USTC ¶ 16,153, at 85,901, 1974 WL 731 (W.D.Ky.1974)). If, on the other hand, a manufacturer uses competitive pricing, or "market pricing," it bases its price on the price established by other firms in the market. Where a plaintiff engages in competitive pricing, the court must determine if the market price includes or lacks an excise tax component. *Tenneco,* 17 Cl.Ct. at 350 (citing *Riviera,* 307 F.Supp. at 917; *GorDag Indus., Inc. v. United States,* 63–2 U.S. Tax Cas.

(CCH), ¶ 15,532, at 90,566, 1963 WL 12684 (D.Minn.1963)).

In the instant case, the Government contends that Plaintiffs determined their prices competitively. The Government explains to the court that "[t]he marketplace will forge a price based upon suppliers who are willing to supply the market with coal at a price that purchasers are willing to pay and at the same time allow suppliers to recover their costs and return of investment." (Docket # 97 at 8.) "Suppliers who cannot supply coal at the market price and still recover their costs will cease supplying coal at these prices." *Id.* Thus, in this case, any sale of coal is made at the price determined by the intersection of supply and demand—the perfect market price—and Plaintiffs must have supplied coal at that competitive market price or they would have gone out of business. These conclusions rest on at least two assumptions: that the market is perfectly functioning, and that all companies are making rational profit-maximizing decisions regarding the price at which they will sell their product. In the instant case, the court finds fault with both assumptions.

First of all, there is evidence here that some large coal buyers have engaged in what the Government might term irrational behavior by paying more for coal from small independent coal companies like Plaintiffs than they would pay for the same coal from a corporate coal Goliath. According to the unrefuted testimony of Merle Mullet and the minutes of the May 5, 1988 board meeting, (ex. E), the larger coal buyers have realized that it is in their interest to keep the smaller coal companies afloat so as to provide competition for the larger coal companies and thereby insure against the higher prices that a less competitive industry would demand. Based on this reasoning, Plaintiffs' optimal price might actually be higher than the theoretical market price espoused by the Government.

Secondly, it was the undisputed evidence at trial that Plaintiffs' behavior did not always conform to the rational profit-maximizing paradigm. To the contrary, Plaintiffs set their price and stuck to it, letting the market

ebb and flow about them. Instead of changing their price, the Plaintiff coal companies had fluctuating levels of demand. When their price was comparably high they sold less coal. When their price was relatively low they sold more coal. While the Plaintiffs' behavior may confound economic theorists who would expect Plaintiffs to raise prices in periods of high demand or lower prices during periods of low demand so as to maximize profits, Plaintiffs were content to maintain steady prices and let the market "come to them."

Indeed, the only way that the market affected Plaintiffs' prices was by setting a theoretical ceiling above which Plaintiffs' prices could not have risen. At exactly what price that ceiling can be found remains unknown, in part due to the "irrational" activity of buyers who will pay a premium for coal from small producers. Whatever that price is, the evidence demonstrates that this theoretical ceiling did not actually limit Plaintiffs' prices. In short, the Government's economic theories fare better in theory than they do in reality.

Finally, the court finds that it must address a matter of some distraction to the Government. During the many depositions taken by the Government prior to trial, agents of Plaintiffs and other deponents made certain statements regarding how the Plaintiffs determined the price of their coal product. When this court considered those very statements in its Order denying summary judgment, it concluded that "[t]he evidence relied upon by the parties is open to different interpretations.... Specifically, there appears to be some confusion as to the proper use of the terms 'spot market price,' 'market price,' and 'competitively determined price,' among the various affiants and experts. It is not clear to the court whether Plaintiffs' expert or officers meant that the price was determined in part by costs and in part by a layman's view of the 'market'— normal arm's length negotiation between buyer and seller, or whether the sale price was instead determined by the broader macroeconomic forces of supply, demand, and competition ..." (Order of November 29,

1995, at 4–5 (docket # 74) (compare, *e.g.*, ex. E (9/11/87 at ¶ 1.) with Ex. C at 5).) The evidence and testimony at trial revealed that the Plaintiffs' witnesses' use of these terms was not inconsistent with each other, but rather was inconsistent only with the Government's preferred use of the terms.[2] Accordingly, the Defendant Government's reliance on its own independent interpretation of those ambiguous terms is misplaced. The court is convinced that Plaintiffs used the cost-plus method of pricing.

In order to determine whether Plaintiffs passed through the tax to customers the court must next determine whether Plaintiffs included the excise tax as a cost in their cost-plus calculus. The Government poses the issue to the court in a theoretical guise. Its argument is, simply put, all companies will pass on all costs to their customers; Plaintiffs earned a profit during the quarters in question, thus, they must have successfully passed through their excise tax costs.

 This court declines the Government's invitation to interpret Section 6416 as a directive that any company which profits has necessarily passed through its excise costs to its customers. *See B & M Co. v. United States*, 452 F.2d 986, 990 (5th Cir.1971) (limiting refunds to businesses which suffer losses unreasonably extends the statute's provisions by implication). Rather, a plaintiff's profits are but one factor to be considered in determining whether the excise tax was included in the price at which they sold their product. *Id.; Tenneco v. United States*, 17 Cl.Ct. at 350. Other possible evidence includes: the subjective belief of corporate officers at the time the payment was due regarding the applicability of the excise tax, *North American Philips Co. v. Church*, 375 F.2d 93 (2d Cir.1967) (Friendly, J.); the methods of accounting for the tax, *Tenneco v. United States*, 17 Cl.Ct. at 350; whether the tax was paid at the time of the relevant transaction or pursuant to a deficiency assessment, *Anderson Co. v. United States*, 447 F.2d 41 (7th Cir.1971); any increase in price following the imposition of an assessment for excise tax, *B & M Co. v. United States*, 452

---

**2.** Indeed, other evidence including Plaintiffs' stagnant prices substantially corroborate the testimony of Plaintiffs' officers that their prices were determined by a cost-plus method.

F.2d at 990; the correlation between price changes and application of the tax; the existence of negotiated contracts including excise taxes, and; the reference to taxes in invoices or sales literature, *Tenneco v. United States,* 17 Cl.Ct. at 350. By evaluating this evidence, the court will attempt to discern what actually happened at the time Plaintiffs priced their product—what were the bases or components for that price.[3]

The court begins its consideration of this question with what is perhaps the most persuasive evidence before it: the subjective belief of the corporate officers involved. The testimony at trial quite clearly established that the officers of the Plaintiff companies made a conscious decision to reduce the amount of federal excise tax which they were paying on ROM coal by an amount equal to the amount of impurities in that coal. (See, *e.g.,* Tr. 168–69.)[4] The minutes of Holmes Limestone directors meetings confirm this decision, especially the minutes of the March 15, 1982 meeting which state:

> 4. Some of the major coal companies in the area are not paying excise, reclamation and other tonnage-based taxes on the sulfur, ash and moisture portions of the coal. The IRS has taken the case to court and lost but is appealing the decision. It was agreed that we also adopt this position and not pay taxes on the moisture, ash and sulfur portions of the coal. . . .

(Ex. E (3/15/82 at ¶ 4).) The debatable validity of Plaintiffs' excise tax deductions notwithstanding, the evidence makes it clear that Plaintiffs did not consider the full weight of their coal product when determining the appropriate excise tax, and thus, did not include the entire tax (as assessed by the IRS) as an integer in the determination of their costs when determining the price of their ROM coal product. This court finding is supported by the accounting of coal sold kept by the company and further substantiat-

ed by the percentage difference between the amount of tax actually paid by the Plaintiffs, and the amount ultimately assessed by the I.R.S. (*See, e.g.,* Exs. 90, 192.) The corporate officers of Plaintiffs did not believe that they were including the taxes here under dispute in the price paid by their customers.

Other evidence which bolsters Plaintiffs' claim that it was they, and not their customers, who paid the taxes in question is the fact that those taxes were paid pursuant to a deficiency assessment, rather than at the time of the transaction. This case does not involve the typical scenario wherein a company is requesting a tax refund from overpayments made on a regular quarterly schedule. In that situation it might be difficult to determine who is "writing the check," the company or the customers. In this case, however, the Plaintiffs paid the amount of disputed tax only after a deficiency assessment which gives credence to the idea that the company, rather than its customers, is footing the bill. The timing and circumstances of their tax payment indicates that Plaintiffs did not pass the cost of the tax through to their customers.

The Government might argue that the Plaintiffs' failure to increase their price after the deficiency assessment demonstrates that they have always included the cost of the tax in their price and thus, no price increase was required (nor would it be allowed by the market). To be sure, companies will typically try to recoup their expenses, and the expense of this particular tax bill may some day cause Plaintiffs to raise their prices on future customers, but Plaintiffs' past performance indicates that a price increase is unlikely. More typical for these taxpayers would be to maintain their historical price and "swallow" any increased expense themselves. In short, the normal inference from

---

3. The caselaw mentions at least two other types of evidence which may be probative of passing or not passing on the cost of the excise tax to customers: refunding taxes to tax-exempt purchasers, and the correlation between prices for taxable domestic sales and exempt foreign sales. *Tenneco,* 17 Cl.Ct. at 350. There is no evidence of such a refund or exempt foreign sale in this case.

4. The Plaintiffs reduced the taxable weight of their ROM coal by different percentages throughout the years before finally settling on 25% as an estimate of the amount of noninherent impurities found in their ROM product.

a price increase or a lack of price increase is not applicable to these Plaintiffs.

The same reasoning disarms the normal inference from Plaintiffs' decision not to raise their ROM coal prices when the excise tax was statutorily increased. Usually, where a company's price does not change commensurate with an increase in the tax rate, one could assume that the increased cost was not passed through to customers. While in the instant case, there is almost no correlation between the Plaintiffs' price and the application of the tax, the court finds that this absence of correlation is the result of Plaintiffs' established business practice of maintaining their price in the face of marginally shifting costs. In other words, instead of evidencing Plaintiffs' payment of the tax in question, the Plaintiffs' prices merely serve as an example of their decision to maintain a stable price. Thus, the lack of correlation between the rate of taxation and Plaintiffs' price is ultimately unhelpful.

There were two exceptions to the general rule which Plaintiffs followed in setting their prices. Changes in the tax rate were reflected in Plaintiff Holmes's long term contracts (as opposed to spot purchase contracts), with PPG Industries and the City of Orrville, Ohio. Specifically, those contracts provided that if the coal excise tax were increased, the contract price could be increased correspondingly. In April of 1987, approximately ten months after the implementation of a five cent per ton excise tax increase, Holmes requested and received a five cent per ton increase on the price of ROM coal sold to PPG and Orrville.

While a pass through of 100% of the additional tax could be seen as evidence that Plaintiffs maintained the practice of passing through 100% of all taxes, the evidence indicated that Holmes was still only passing through a fraction of the original tax to which the five cent increase was added. In other words, Holmes passed through to Orrville and PPG: (1) the cost of the excise tax as determined by the weight of the ROM coal sold after reduction for what Holmes considered to be noninherent impurities, and (2) 100% of the five cent increase. Importantly, Holmes did not pass through that portion of the tax which it believed was not due—that portion corresponding to the noninherent impurities in the ROM coal.[5] The court does not understand Holmes to now request a refund for any portion of that five cents per ton tax which they clearly passed through to PPG and the City of Orrville.

While the increase in cost for these two contracts corresponds to the increase in the excise tax, the court views the two contracts as exceptions to the Plaintiffs' typical practice, rather than as examples of that practice. They are the only two contracts which priced coal in such a manner, and the court finds them as probative of little, save that had Plaintiffs desired to increase the price of their coal to correspond with tax changes and thus pass along the cost to their customers, they knew how to do so. The evidence demonstrates that with these two explicit exceptions, Plaintiffs chose not to pass along the excise tax increase.

In addition, Plaintiffs have sought to establish that they did not pass through the cost of the excise tax to their customers with evidence that they did not refer to the tax on their invoices or sales literature. However, Plaintiffs here are not in the position of a typical taxpayer seeking a refund. Usually, those taxpayers are seeking to show that, because the taxpayer was unaware of the tax or did not believe it applied to their product, their price did not include any of the taxes which they were subsequently assessed. Thus, evidence such as the lack of mention of excise taxes on invoices creates an inference that the typical taxpayer did not include the excise tax in his product's price.

Here, however, Plaintiffs readily assert that they included 75% of the excise tax in their customers' purchase price—they only contest inclusion of the other 25% which they later paid after an IRS assessment. No evidence before the court indicates that Plaintiffs' invoices or sales literature mention the inclusion of the 75% portion of the tax

---

**5.** Holmes did not pay taxes on this "noninherent impurity" portion until the IRS found a deficiency, and assessed the additional taxes. *See supra.*

which, according to Plaintiffs, was included in their ROM coal price. Thus, the lack of mention of excise taxes on invoice forms does not in any way bolster Plaintiffs' claim that 25% of the excise tax was not passed on to the customers. Of course, this failure to mention the excise tax does not buttress the Government's argument that 100% of the assessed tax was passed through, either. Under the facts of this case, this evidence is simply not probative.

After careful consideration of all of the evidence, the court concludes that Plaintiffs have proven by clear and convincing evidence that they included only a reduced percentage of their excise tax liability (as assessed by the IRS) in the cost of their ROM coal product, which percentage was no more than 75%.[6] The court bases this conclusion on what the evidence indicates actually happened. The Plaintiffs made an actual decision to reduce the amount of tax that they paid by the amount of noninherent materials they believed to be in their coal. The Board minutes reflect this decision, the companies' records indicate this reduction, as do the returns and the assessments by the IRS. Plaintiffs did not pay the amount of excise tax now in dispute until the deficiency assessments were made. While Plaintiffs did make a profit, profit alone is insufficient to negate all of the evidence indicating that they did not pass on the excise taxes in question to their customers.

Because the Plaintiffs set the price of their coal on a cost-plus basis and because they did not pass on the cost of the amount of taxes now in dispute, Plaintiffs have standing to assert their claims for a refund of that amount of the tax which they paid pursuant to the IRS deficiency assessment, insofar as that refund does not exceed 25% of the total excise tax paid.

**Coal Pursuant to 26 U.S.C. Section 4121**

■ The parties dispute the amount of the excise tax owed by Plaintiffs on coal mined between March of 1982 and December 1988.

That dispute arises directly from another dispute about the correct interpretation of a revenue statute, 26 U.S.C. Section 4121, and its regulations. Specifically, the parties disagree as to the meaning of the word "coal" as used therein.

Section 4121 imposes an excise tax on coal from mines in the United States which coal is sold by the producer, and which tax is equal to a specified rate per ton. The statute excludes lignite from the tax, establishes the tax rates applicable to coal from surface and underground mines, defines how one should determine if coal is from either a surface or underground mine, and even defines "United States" and "ton." The statute does not, however, define "coal."

Consequently, the parties have provided the court with two contrasting definitions of coal. Plaintiffs argue that the term "coal" as used in the statute is unambiguous; coal is simply "pure coal" plus inherent non-coal materials including in-seam shales and inherent moisture. According to Plaintiff, all other "non-inherent" materials found in unwashed or Run of Mine (ROM) coal are not included as "coal" and are not subject to the Section 4121 excise tax. These other materials consist of non-inherent ash, sulphur, moisture, and "in-seam shales removed by washing," as well as dirt and rock shales known as brown sandy shale, brown gray shale, gray shale, sandy clay, gray shale, dark gray shale, overburden and underclay. Plaintiffs offer the coal washing process as a practical means of arriving at a reasonable semblance of the separation of what they define as "coal" from the non-coal. The product that would remain after the ROM coal was washed is sufficiently close to Plaintiffs' definition of coal upon which they are willing to be taxed. Of course, the coal product actually in question here is ROM or unwashed coal, so Plaintiffs ask the court to project what the weight of the ROM coal would be if cleaned.

**6.** The sole exception to this holding is that the percentage passed through by Plaintiff Holmes to PPG and the City of Orrville will necessarily be higher than 75% because Plaintiff Holmes passed through 100% of the five cent increase beginning

in April of 1987. Holmes's standing to recover a refund for taxes paid is thus marginally reduced by an amount equal to the total paid by these two customers as part of the five cent pass through.

The United States disagrees with Plaintiffs' narrow view of "coal," arguing that the term was left undefined by Congress in the expectation that the Internal Revenue Service would provide a reasonable definition. The government further argues that the I.R.S. has provided just such a definition in the federal regulation provided at 26 C.F.R. § 48.4121–1(d)(4). Moreover, the government argues, that regulation has been reasonably interpreted in Revenue Ruling 79–119, 1979–1 CB 350. The government argues that "coal" includes all of the materials which comprise ROM coal, including shales, ash, sulphur, and the rest.

The rules of statutory construction are well established and have been laid out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82. Typically, if Congress has explicitly left a gap for the agency to fill, that regulatory elucidation should be given controlling weight unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44, 104 S.Ct. at 2782. If the legislative delegation to the agency is implicit, that regulatory interpretation should only be given deference if it is reasonable. *Id.* at 844, 104 S.Ct. at 2782.

■ These rules of construction guide this court in most situations, however, materially different rules have been adopted for the interpretation of a revenue statute. "[A]s for any statute, the starting point is the words of the statute, taking the words in their ordinary meaning in the field of interest, and giving full effect to 'every word . Congress used.' [*However,* a]s a special rule in tax cases, 'if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer.' " *Xerox Corp. v. United States,* 41 F.3d 647, 658 (Fed.Cir.1994) (citing *Bread Political Action Committee v. Federal Election Commission,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1235, 1237–38, 71 L.Ed.2d 432 (1982); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *Hassett v. Welch,* 303 U.S. 303, 314, 58 S.Ct. 559, 564–65, 82 L.Ed. 858 (1938); *Auto–Ordnance Corp. v. United States* 822 F.2d 1566, 1571 (Fed.Cir.1987)), *cert. denied,* —— U.S. ——, 116 S.Ct. 72, 133 L.Ed.2d 32 (1995); *see also, Weingarden v. Commissioner,* 825 F.2d 1027, 1029 (6th Cir. 1987) ("The general canon of construction is that statutes imposing a tax are interpreted liberally (in favor of the taxpayer)."); *Porter v. Commissioner,* 288 U.S. 436, 442, 53 S.Ct. 451, 453, 77 L.Ed. 880 (1933) (referring to the "familiar rule" that tax laws are to be liberally construed in favor of taxpayers).

The first step for this court is to give "coal" as used in the statute its "ordinary meaning in the field of interest." There is no doubt as to the construction of the statute; both sides of this dispute have agreed that Section 4121 refers to coal in its commercial sense. It is left to this court merely to determine the definition of coal as that term is used in the mining industry.

Still, defining this commercial product, coal, remains a troublesome task especially considering that reasonable experts cannot and do not agree on what constitutes coal. (Davis Tr. at 1071.) A description of the coalification process will help demonstrate the difficulty of this task. At trial, Dr. Davis credibly explained the coalification process as follows:

> Coals were formed at different periods in the geologic past. The coals that we are concerned with in this case are coals of the Pennsylvanian period, and these were laid

down in swamps that existed under conditions that were more or less tropical during those times. And, of course, the plants that gave rise to them were somewhat different than the plants that exist today.

At that time the earth's crust was undergoing intermittent subsidence, and so what would happen is these peat layers (that consisted of materials from trees, their roots and stems and barks, and the various resins and spores that they produced) were laid down in these peat bodies. And then as a result of this intermittent subsidence, these peat layers would be drowned by the waters carrying sediment in over the top of them, so that they would be buried. And then those coals would be buried under shales and sands, and maybe limestones, until the waters receded a little, when another forest was able to establish itself, giving rise to another peat. This period of subsidence continued, and eventually these peats were buried to fairly considerable depths of several kilometers. As a result of that burial, ... the peats would be subjected to fairly high temperatures. And, of course, they would be buried under the pressure of this overburden ... over a period of ... let's just say, 250 million years. They slowly became changed from peat through lignite, sub-bituminous coal, all the way up to anthracite, and in extreme cases to metianthracites. And then eventually, as a result of other changes within the earth's crust, these deposits would be elevated back up closer toward the surface again where we have the opportunity to extract them by mining. The changes still continue. And when these coals are sitting, let's say, exposed at the surface, they may, under some circumstances, tend to degrade or oxidize somewhat. And that really is basically the end of the story at that point.

[T]he earliest stages of coal formation, the conversion to lignite, probably takes place over a period of some thousands of years, or a small number of millions of years. But then by the time these materials have been buried to, let's say, 70 million years ... then they will be well on their way to becoming bituminous coal.

When those pits are laid down, they contain a large amount of water, 70 or 80 percent. But over the period of time, as the material becomes compacted, that water is squeezed out of the pores. And so as we go to higher and higher ranks of coal, the moisture contents get less and less. And here I'm talking about ... the inherent moisture, the amount of moisture that normally would be found in those coals that was buried within the earth's crust[. M]inerals are introduced into the coal at the time the coal is laid down, they are washed or blown into the swamp as little grains of sand, if you like, or deposited as layers of mud or clay within the coals. The pyrite, the iron ore, or the sulfur rock that has been referred to, crystallizes out in the coal as a result of interactions between bacteria that were living in the peat, interacting with sulfate dissolved in solution. Those bacteria, in an environment where there was no oxygen, those bacteria needed oxygen from somewhere and they would get it by extracting it from the sulfate solution that came from the sea waters that were often available under these conditions. And so the bacteria would extract the oxygen from the dissolved sulfate, and in the course of that produce sulfur which interacted with iron in these peats to produce iron sulfide, which is the mineral, the sulfur rock that is sometimes found.

\* \* \* \* \* \*

In the early stages of coalification, moisture is an inherent part of the coal structure, because the coal at that point is a jell. It's a jell, so these materials are held in suspension in the water, but eventually we reach the point where the coal becomes solid and so the water is filling the pores, it's bound onto the surface of the coal. It's part of the chemical structure, to some instances, but does not really participate in the coalification process.

(Tr. 981–83, 985–86.) *See also* American Society for Testing and Materials, *Annual Book of ASTM Standards,* 189–90 n. 5 (1990).

The court repeats this explanation of the coalification process for at least two pur-

poses. First, Dr. Davis's explanation puts our discussion in context. Second, and more importantly, the above explanation helps explain that "coal" is going to be composed of organic materials such as plants and peat, inorganic materials found in those plants, other inorganic materials which joined with the organic materials thousands or millions of years ago, and some amount of water. What we see as a coal seam is simply a snapshot in time, albeit due to the mining, the last snapshot in time. The composition of the coal seam will necessarily vary and, if left to follow nature's course, will evolve into different purities of coal—some becoming more pure, some oxidizing completely. There is no such thing as "pure coal" in nature, nor could there be in the mining industry. Thus, it is inconceivable that the coal referred to in the Black Lung Tax provision in question is nonexistent "pure coal."

Indeed, the evidence demonstrates that "pure coal" does not exist outside the laboratory, in a commercial setting. (*See, e.g.,* Davis Tr. at 1006–08.) To be sure, some coal is purer or cleaner than other coal, but all coal contains some impurities. What the parties have asked this court to do, in effect, is to tell them at what point the impurities become so great that the material which Plaintiffs have mined becomes something other than coal.

To aid the court in this determination, the parties have provided several definitions of coal. First, the parties reference the definition of coal as promulgated by the American Society for Testing and Materials in 1972: "Coal is a rock member of a natural series of carbonaceous sediments derived from plants. It must be distinguished from other components of the series and from other similar rock types." American Society for Testing and Materials, *Annual Book of ASTM Standards,* 548 (1974) (Definition promulgated in 1972). The ASTM then explains, "The following definitions establish the limits for members of this natural series." *Id.* Those definitions include "peat" which is a precursor to coal; "coal," "a readily combustible rock containing more than 50 weight percent and more than 70 volume percent of carbonaceous material including inherent moisture,

formed from compaction and induration of variously altered plant remains similar to those in peat. Differences in the kinds of plant materials (type), in degree of metamorphism (rank), and in the range of impurity, are characteristic of the varieties of coal." *Id.* Finally, the ASTM defines "graphocite" as the "end product of coal metamorphism." (Exs. AAAA, 209.) Thus, according to the ASTM, "coal" is a substance which exists for some period of time between its beginning as "peat," and its end as "graphocite."

This description of coal was refined in later editions of the ASTM Standards to: "A brown to black combustible sedimentary rock (in the geological sense) composed principally of consolidated and chemically altered plant remains." American Society for Testing and Materials, *Annual Book of ASTM Standards,* 370 (1982) (See identical definitions in the later editions of 1988, 1990, 1991, 1994, 1995. (Exs. AAAA, CCC, 46, 47.)) ASTM standards purport to be the result of "a full consensus of all concerned parties." Moreover, ASTM standards "become legally binding only when a government body references them in regulations, or when they are cited in a contract." ASTM, *Annual Book of ASTM Standards,* at iv (1995).

The United States Department of the Interior provides similar definitions in its *Dictionary of Mining, Mineral, and Related Terms,* 222 (compiled and edited by Paul W. Thrush et al.) (1968). Definition "a" explains that coal is "[a] solid, brittle, more or less distinctly stratified, combustible carbonaceous rock, formed by partial to complete decomposition of vegetation; varies in color from dark brown to black; not fusible without decomposition and very insoluble. The boundary line between peat and coal is hazy ... as is the boundary line between coal and graphite and the boundary line between carbonaceous rock and coal.... The differences in coals are due to age, pressure (folding and/or depth of burial), and heat, which may have been supplied by transecting dikes or by movement in the rocks. It has been suggested that coal when dried at 100° C should contain at least 50 percent combustible material...." *Id.* Definition "b" provides: "Coal is a combustible sedimentary

rock formed from plant remains in various stages of preservation by processes which involved the compaction of the material buried in basins, initially of moderate depth.... Coals are characterized by their type, determined by the nature of the plant remains ... The variations in rank are of great importance in the classification of coal.... The various constituents, called macerals, occur in characteristic associations, microlithotypes which may include in more or less mixture [20] percent[7] by volume of mineral matter. The amount of minerals which coal can contain and still retain its name depends on commercial considerations which vary from one country to another." *Id.*

In sum, these definitions explain that what we see as coal is that which is no longer peat and which has yet to become graphite. The borderlines are hazy. The composition of the substance varies; one source offers limits of at least 50 percent combustible material but in the next definition states that coal should retain only about 20 percent by volume minerals. . These definitions do confirm the other evidence available to the court in one important respect: they all contemplate some level of mineral content but require a predominance of organically-derived combustible rock. None of these definitions provide the answer which this court has been charged with finding; none denote a definitive percentage of mineral material which can be in the coal product before it loses its recognition as coal. Perhaps the Dictionary of Mining, Mineral, and Related Terms is the most instructive when it states, "The amount of minerals which coal can contain and still retain its name depends on commercial considerations which vary from one country to another." *Id.*

The evidence thus far discussed does not support Plaintiffs' argument that the level of minerals contained in coal must be limited to only that which was originally part of those plant remains. Plaintiff's definition, while quite acceptable for some purposes and certainly useful in the scientific community, is

just as certainly not the one used in the industry. It is not a *commercial* definition of coal. Still, Plaintiffs' practical means of achieving that definition, the washing process, has some appeal because it is used throughout the coal mining industry and thus might be seen as evidence of what is considered to be "coal" by that industry.[8] However, Plaintiffs resort to a *theoretical* version of the washing test. Their coal product was not sold washed, instead, it was sold as unwashed coal—a coal product for which there is undeniably a market. Thus, if anything, Plaintiffs' advocacy of a *theoretical* washing test reinforces the notion that ROM coal is a commercial product which the industry recognizes as "coal."

Defendant asks the court to find that coal can contain a much higher level of impurities and still be considered coal, in a commercial sense. Defendant's expert, Dr. Davis, went so far as to suggest that "coal" was any mixture or collection of material in which over 50% of the weight is the combustible sedimentary rock derived from plant remains. (Ex. A at 9–10; Tr. 994–95.) Thus, if one had a bushel containing 50.1% of chemically pure coal and 49.9% rocks and bricks, the Defendant claims that the bushel, taken as a unit, is a bushel of coal. This definition of coal strains common sense.

But in fact, this example is as absurd as the logic which prompts it, because it simply never happens that a truckload of ROM coal is sold which contains 49.9% rocks and bricks. This is a commercial impossibility with which the court and the parties need not concern themselves. Again, we are talking about the commercial mining industry's use of the word coal. As has already been described, many coal producers such as Plaintiffs sell ROM coal. That is, they remove as much of the overburden as commercially possible, and then, taking as little of the underclay as is practicable, (see Tr. at 408), they scoop out the coal and place it in a truck in which it is delivered, unwashed, to the buyer. If there is a discernible mineral parting in

---

7. While the exhibit states this percentage as 0.2 percent, the court has taken credible testimony that that figure is a misprint; the authors intended that figure to be 20 percent. (Tr. at 996.)

8. Indeed, countless mining companies use that process to wash impurities out of their mined product, so that they can sell cleaner, purer, coal.

the coal, it may be removed by the operator of the front end-loader who actually removes the coal from the earth. (*See, e.g.,* Davis Tr. at 1050.) If the parting is of insufficient size to be removed, it too is loaded into the truck and sold to the buyer as ROM coal. Thus there can be some considerable impurities in the ROM coal—Plaintiffs claim about 25%. But the amount of impurities is limited by several market factors. First, the buyers will not buy ROM coal below a certain level of purity because its heating potential does not meet their needs. (*See, e.g.,* Tr. 977–78; Lewis Tr. 645 (fifty percent ash content would not be commercial coal).) Secondly, most ROM coal is sold based upon its Btu value and thus it would not be cost-effective for coal producers such as Plaintiffs to mine and transport a large amount of non-Btu producing inorganic minerals to the buyer. The market has built a minimal level of purity into the ROM coal. Combining these considerations with Plaintiffs' evidence that their average level of impurities is 25% our inquiry is limited to whether coal that is, on average, one quarter impure is coal nonetheless.

■ Even viewed liberally in favor of the Plaintiff taxpayers, the evidence this court has taken demonstrates that "coal" within the meaning of the coal industry, and therefore within the meaning of the revenue statute, includes Plaintiffs' ROM coal. All the evidence before the court demonstrates that coal with approximately 25% impurities is indeed marketable and is sold as coal daily. No definition before the court precludes this understanding of coal, indeed, coal with roughly 25% impurities might be easily anticipated considering our knowledge of the coalification process. Even the authoritative books on mining terminology leave wide room for commercial application of their definitions. This certainly makes sense to the coal producer who knows coal as a product which he can sell at a given price for profit. If the coal product is sufficiently pure, and has a sufficiently high heating capability to make it marketable, it is a "coal" for the miner's purposes. This court cannot help but come to the same conclusion: That which is sold as coal is coal. Put another way, that substance which is commercially traded in a competitive market as coal is coal for the purpose of defining a taxable commodity.

Furthermore, this understanding of "coal" in the field of interest—the mining industry, is supported by the understanding of coal in the field of taxation as expressed by Revenue Ruling 79–119, 1979–1 CB 350, which this court should not disregard. *See United States v. Swank,* 451 U.S. 571, 590, 101 S.Ct. 1931, 1942, 68 L.Ed.2d 454 (1981) ("Revenue Rulings and other interpretative documents do not have the same force as Treasury Regulations[, b]ut this fact does not mean that the consistent interpretation of the Service may be disregarded because the Court feels another interpretation is more reasonable"). That Revenue Ruling provides: "The [federal excise tax on coal, Section 4121,] applies to the full tonnage of raw coal delivered by the producer to the preparation plant operator with no reduction for extraneous material subsequently removed." Rev. Rul. 79–119, 1979–1 CB 350; *see* Plaintiffs' ex. 204. Based on the evidence regarding the meaning of "coal" in the industry, the court finds the IRS's Revenue Ruling to be reasonable, and moreover, it is itself evidence of the meaning of "coal" pursuant to Section 4121. *See State Bank of Albany v. United States,* 209 Ct.Cl. 13, 530 F.2d 1379, 1382 (1976) ("[A revenue ruling] may be helpful in interpreting a statute, but it is not binding on the courts.").[9]

9. Contrary to the position of the Government, the court does not find that the regulation in question, 26 C.F.R. § 48.4121–1(d)(4), aids the court in determining the meaning of coal as used in the field of interest. Rather, the regulation merely tells us how to determine the tonnage sold and sales price of coal under 26 U.S.C. § 4121. Specifically, the regulation designates the appropriate point at which the two types of coal, washed and unwashed, are to be weighed for purposes of determining the amount of the excise tax. The regulation advises that, in the case of cleaned coal, the tax is to be computed based on the weight of the coal at the cleaning point. In other words, if the coal is cleaned, the tax is imposed on the purer, cleaned coal and not on the material that is removed in the cleaning process. If the coal is not cleaned (ROM coal), then the amount of coal and, consequently, the excise tax, is determined at the mine itself.

Defendant argues that this regulation must be read to tax the weight of the ROM coal including

■ The court does, however, acknowledge two minor exceptions to its conclusion that ROM coal is "coal" within the meaning of 26 U.S.C. Section 4121(a), and therefore 26 C.F.R. Section 48.412–1(d)(4). The first exception is that the excess water found in ROM coal can be excluded from its total weight. This finding is based not upon the evidence, nor upon this court's understanding of "coal," but rather on the fact that the IRS does not contest Plaintiffs' argument that the weight of taxable coal does not include the weight of excess water found therein. (*See*, *e.g.*, docket # 97, at 12.) In the lead case on this issue, *A.J. Taft Coal Co. v. United States*, the United States District Court for the Northern District of Alabama found that "coal" as used in Section 4121 does not include water in excess of the product's inherent moisture content. 605 F.Supp. 366 (1984), *aff'd by*, 760 F.2d 279 (11th Cir.1985) (Table, No. 84–7594), and 760 F.2d 280 (11th Cir.1985) (Table, No. 84–7567). The excess moisture in that case apparently consisted primarily of water added to the coal product during the washing process itself. *See id.* at 367–69. The I.R.S. subsequently adopted this definition in Revenue Ruling 86–96, 1986–2 C.B. 181 ("[The I.R.S.] will follow the *Taft Coal Co.* decision regarding the moisture content of coal. The Service will allow a calculated reduction of the taxable weight of coal for the weight of excess moisture ...."). Thus, in the instant case, the question for the court is whether Plaintiffs have provided sufficient evidence to demonstrate a reasonable basis for determining the amount of the excess moisture deduction.

Before addressing the actual percentage levels of moisture found in Plaintiffs' coal, the court makes at least one prefatory finding. While the inherent moisture level of coal will vary from seam to seam, the coal seams involved in this dispute are all of the same rank, the same coal basin, and the same structural stratigraphic position, and they are all exploited via surface mining so they will have basically the same saturation component, despite slight changes from one seam or county to the next. In short, there will be little variation between seams. (*See* Tr. at 447.) At trial, the Plaintiffs presented some limited evidence of the moisture content of the ROM coal they sold. Before conducting a study specifically to aid in the resolution of this dispute, Mr. Lewis states the industry "guesstimate" for moisture in these Ohio coals is 3.5%. (Tr. 652.) To test this "guesstimate," Mr. Lewis examined seven core samples taken in 1979–80, which evidenced equilibrium[10] moisture levels of 4.13%, 4.21%, 3.84%, 4.03%, 3.96%, 3.83%, and 4.46% in Plaintiffs' coal fields, (Tr. 413, 435; ex. 39), which average to 4.066%. In addition, Mr. Lewis claims to rely on a report of the Ohio Department of Natural Resources indicating that 22 independent samples contained an average inherent moisture level of 2.7%. (*See* Tr. 653.) Based on this data, Plaintiffs arrived at a "reasonable if not conservative" estimated average inherent moisture level of 4%. (*See* Tr. 650.)

all impurities that would be washed out if the coal were cleaned, otherwise there would be no reason for the regulation to include the method for determining the amount of cleaned coal sold. If the regulation had intended that ROM coal be taxed based only on its content of purer, cleaned coal then the language providing that cleaned coal be measured at the cleaning point would be redundant; one measuring point, f.o.b. mine, would suffice for both types of coal, clean and uncleaned. On the other hand, the language regarding the f.o.b. for cleaned coal could be credibly explained as a specific application of a general preference for taxing coal in its cleanest form. Without knowledge of what "coal" means pursuant to the statute, the regulation could be read to normally allow for an estimation of the weight of cleaned coal that could be derived from ROM coal, but provide that the actual weight of washed coal be used when known. In short, the regulation clarifies the meaning of "coal," not one whit.

The parties have also submitted some evidence regarding the legislative history and purpose of Section 4121, and arguments based on the purpose of the tax. The court does not reach that evidence and argument because it has already determined that the coal industry includes ROM coal in its understanding of the term "coal." It would be inappropriate for this court to look to extraneous evidence of legislative intent where, as here, the statute can be readily interpreted by "taking the words in their ordinary meaning in the field of interest." *Xerox*, 41 F.3d at 658.

10. Equilibrium moisture levels are recognized as being the practical equivalent of inherent moisture levels.

The Government offered evidence conflicting with Plaintiffs' proposed findings on the level of inherent moisture in the coals they mined. The average of the thirteen relevant samples tested and collected between 1974 and 1994 in a Penn State University Coal Data Base, reveals a higher average inherent moisture level of 5.97%. (Ex. DDDD; Tr. 1031–32, 1085.) The Government also discovered that Information Circular 47, published in 1978 by Botterman and Smith, states that in Coshocton County inherent moisture in coal was at the 5.1% level. (Tr. 1029). Twenty-four values taken, generally speaking, south of Plaintiffs' mining areas including Coshocton, Lawrence, Mahoning, Tuscarawas, Perry, and Vinton counties averaged at 6.2% inherent moisture.

Based upon all of this evidence, the court concludes that Plaintiffs have not established that their ROM coal contained only 4% inherent moisture. The evidence does demonstrate, however, that the average inherent moisture level of the Plaintiffs' coal was no greater than 6%. The court will thus use this percentage as the standard for all future calculations.

Having determined a maximum reliable percentage for the inherent moisture found in Plaintiffs' ROM coal, the court must next determine the average total moisture content of that coal, so that we might arrive at the excess moisture content which Plaintiffs' will ultimately be able to deduct from the weight of their coal, and accordingly, from the amount of excise tax that was owed. The evidence indicates that crushed coal sold by Plaintiffs to the city of Orrville between 1982–1987 had total moisture levels averaging 9.6%. (Ex. 80f.) In 1991–93, Holmes Limestone mined the same coals and used the same mining processes as in the eighties, (see Tr. 437, 647–49, 661), and took approximately 1100 samples of their coal seams—the same seams mined by all Plaintiffs—finding average moisture levels of 7.62%, (ex. 80e), 9.73% (ex. 80d), and 7.53% (ex. 80c), respectively. Based on this exhaustive pool of data, Plaintiffs believe that the average total moisture of their coal product between March of 1982, and December of 1988, was slightly

greater than 9%.[11] The court finds that the average total moisture of Plaintiffs' coal during the period in question was at least 9%, and therefore, 9% is a reasonable figure from which to subtract inherent moisture to determine excess moisture.

After considering this and all other relevant evidence presented at trial, the court finds that Plaintiffs have proven that their ROM coal product which is currently in question contained 6% inherent moisture and 9% total moisture, thus leaving 3% non-inherent or excess moisture. As the Government readily admits, the weight of excess moisture can be subtracted from the weight of coal subject to the excise tax, therefore, Plaintiffs are entitled to reduce their taxes paid in the relevant years by 3%.

 The second exception to the court's finding that that which is sold as ROM coal is "coal" pursuant to Section 4121, involves that portion of the ROM coal which can be attributed not to the material from the coal seam, but rather to the overburden and underclay. Again, the Government does not seek to collect the excise tax on these out-of-seam impurities. (See Tr. at 23 ("The Government is not seeking to tax overburden or underburden or out-of-seam impurities. That's not what we're about here.").)

It was undisputed that even careful coal removal personnel tend to harvest one or two inches of out-of-seam material, such as the overburden, for each seam that they enter. (Tr. 408.) The Plaintiffs' expert estimates that the ROM product contains anywhere from 3%, (Tr. 672), to 8%, (Tr. 409), out of seam dilution by weight. While the court is convinced that the Plaintiffs' ROM coal product contained *some* out-of-seam material which the government does not seek to tax, the Plaintiffs' estimates as to the amount of that material are more appropriately labeled guesses, as they are not supported by any sort of testing or sampling in the field. The court acknowledges Mr. Lewis's expertise, but without knowledge of some empirical data upon which his conclusions rest, the court simply cannot accept his best guess as to the weight of the out-of-seam material

11. The additional moisture was added to the coal by the mining process. (*See* Tr. at 437.)

included in the ROM. In short, there is not adequate evidence to provide a reasonable basis for determining the amount of out-of-seam material contained in Plaintiffs' ROM coal product. Absent such evidence, no deduction for out-of-seam material can be allowed.

To summarize, the court holds that the term "coal" as used in the relevant field of interest and as used in 26 U.S.C. § 4121, and the regulations promulgated thereunder, includes Plaintiffs' unwashed or ROM coal product. Plaintiffs were obligated, therefore, to pay excise taxes on the full weight of that ROM product, less 3% which represents excess moisture added to the coal during the mining process. On this count, judgment is for the Plaintiff coal companies for an amount equal to 3% of those excise taxes paid for the quarters here at issue, and any interest or fines associated with that amount.

### The Rodco Fraud Penalty

The IRS has assessed Plaintiff Rodco for civil fraud penalties pursuant to 26 U.S.C. § 6653(b) [12] for Rodco's alleged intentional failure to file quarterly excise tax returns and for its failure to pay any excise taxes during the period of March 31, 1979, through June 30, 1984. Rodco admits that it made no quarterly excise tax filings or payments during that period, but alleges that these failures came about as a result of oversight and mistake. The United States disagrees, arguing that Rodco was aware of its duty to pay the tax and intentionally declined to do so. When the fraud penalty was assessed, Rodco paid it but now the company challenges the appropriateness of that penalty and seeks a refund of the amount paid.

■ Although the Government acknowledges that it is well established in the Sixth Circuit that it must prove Section 6653(b) fraud by "clear and convincing" evidence, *Hagaman v. Commissioner,* 958 F.2d 684, 696 (6th Cir.1992) (citing *Smith v. Commissioner,* 926 F.2d 1470, 1475 (6th Cir.1991); *Traficant v. Commissioner,* 884 F.2d 258, 263 (6th Cir.1989); *Zack v. Commissioner,*

692 F.2d 28, 29 (6th Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983)); *United States v. Walton,* 909 F.2d 915, 925–26 (1990), the Government asks this court to apply the lower preponderance-of-the-evidence standard to its case. The Government Defendant criticizes the clear and convincing standard as baseless, indicating that courts which apply such a standard are doing no "more than borrow[ing] uncritically the common law rule." Docket # 96, at 28 (quoting *United States v. Walters,* 176 B.R. 835, 873–74 (Bankr.N.D.Ind.1994).) This argument is strengthened by an unanimous Supreme court opinion regarding the fraud standard applicable to nondischargeability of tax debts in bankruptcy, *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). In that case, the Court reasoned that absent some evidence that Congress intended a higher standard to apply, the preponderance-of-the-evidence standard was presumed in civil actions between private litigants. *Id.* Nevertheless, the Government has not effectively distinguished Sixth Circuit opinions such as *Hagaman* or *Walton,* both written after the Supreme Court's opinion in *Grogan,* and both adhering to the clear and convincing standard in fraud cases brought pursuant to Section 6653(b). This court must not assume that the Sixth Circuit was unaware of the Supreme Court's analysis in *Grogan,* but instead recognizes that *Grogan* is merely persuasive and not controlling law on this question. The court declines to depart from the Circuit's long line of precedent on this issue; the Government must establish its allegation of fraud by clear and convincing evidence.

■ The parties concede that the trial court's determination on the issue of fraud is ultimately one of fact. *Hagaman,* 958 F.2d at 696. "In order for a court to find a taxpayer guilty of fraud under Section 6653(b), the [Government] must show that the taxpayer 'intended to evade taxes which he knew or believed that he owed by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes.'" *Id.*

---

**12.** That section provides, in pertinent part: "If any part of any underpayment ... of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount ... which is attributable to fraud." 26 U.S.C. § 6653(b).

(quoting *United States v. Walton*, 909 F.2d 915, 926 (6th Cir.1990)). The government does not need to establish that tax evasion was a primary motive, but may satisfy its burden of proof by showing that the taxpayer's conduct was motivated in part by a desire to evade taxes. *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943). Intent to evade can be inferred from strong circumstantial evidence. *Id.; Hagaman*, 958 F.2d at 696. The Sixth Circuit includes among the indicia of fraud: a consistent pattern of failure to file tax returns; implausible or inconsistent explanations of behavior; failure to produce records or to keep adequate books and records; evidence of knowledge of tax laws; and willingness to defraud another in a business transaction. *Solomon v. Commissioner*, 732 F.2d 1459, 1461–62 (6th Cir.1984). However, the failure to file a return is not in itself sufficient to prove fraud. *Id.* at 1461.

 In its consideration of the evidence, the court finds that it must first describe the context of Rodco's failure to file excise tax returns. Rodco was a corporation formed for the purpose of mining coal and minerals in the same geographical area as that utilized by Plaintiff Holmes. Rodco was at its inception and for some time thereafter a smaller producer than Holmes and a company which did not command a significant share of the coal or mineral market in its major sales area. On occasion it was a supplier to Holmes.

At a point in 1979, Holmes purchased one-half ownership of Rodco. Later in April of 1981, Holmes purchased the balance of the company. During this interim period, Mr. Arthur Downend continued to run the day to day operations of Rodco and he and his wife kept the books and records, but Holmes did have its officers sit on the Rodco Board of Directors. As has been suggested, Rodco was not a thriving corporation. Mr. Downend, its president, director, and shareholder, was not at that time very knowledgeable in the coal business. He had entered the business with a few partners, one of whom had mining experience, however, that partner unfortunately passed away shortly after the company's inception. Mr. Downed

did, however, acquire assistance in the tax area from the accounting firm of Peat, Marwick and Mitchell. Mr. Downend testified credibly that from 1975–1979 no one at Peat Marwick ever made him aware of any excise taxes owed by Rodco.

At about the time of Holmes's acquisition of one-half of Rodco, Rodco took on Mr. Harry Shaw as its new accountant. Mr. Shaw also happened to keep Holmes's books. Using forms provided by Mr. Shaw, Mr. Downend and his wife prepared monthly financial statements (*see* ex. UUU) for review by Holmes and the Board of Directors. Curiously, that form contains spaces for the amount paid by Rodco in personal property tax, federal severance, state severance, corporate franchise, sales tax, and payroll taxes, but contains no space for federal excise taxes. Of course, the lack of mention of excise taxes was not surprising to Mr. Downend as he was unaware that such tax liability existed.

The form's creator, Mr. Shaw, tells us that he remembers speaking to Merle Mullet about coal excise taxes, but he does not recall specifically discussing Rodco's excise taxes. He admits that he set up Rodco's financial records to be consistent in form with Holmes, and created the financial sheet in question, but does not recall why the excise tax was not included on the form. Mr. Shaw's recollections are somewhat suspect on the surface, but perhaps this can be explained by consideration of the passage of time since the incidents in question, Mr. Shaw's subsequent heart attack, and his separation from active duty with his firm. His present recollections, however, do support the view that Holmes maintained a comprehensive plan of caring for corporate business including the payment of taxes. He further draws our attention to certain printed forms, portions of which could and should have been used to designate taxes paid or due, which portions were not utilized.

Wade Mullet maintained the books and records of Holmes. His duties included the filing of all tax returns including federal excise tax returns. However, Mr. Mullet had very little involvement with Rodco between 1979 and 1981. It was not until Holmes took

100% ownership of Rodco in 1981 that Wade Mullet became Secretary and office manager for Rodco. In that role, Mr. Mullet prepared tonnage reports for the company and compiled the information necessary to prepare the monthly financial reports. He created and maintained all Rodco files, handled the checking accounts and payments therefrom, and checked the accountants' work on income and reclamation taxes. In this way, his duties for Rodco largely mirrored his work for Holmes. Indeed, it appears that Mr. Mullet was more familiar with Rodco's production and business affairs than perhaps anyone in the Holmes organization.

Under such circumstances as these, given the apparent care and thoroughness Mr. Mullet gave to his business affairs, it is not possible for this court to believe that Rodco's failure to pay excise taxes after Mr. Mullet began his work there was inadvertent. Mr. Mullet's position that Rodco's failure to pay taxes was not known to him is an implausible one; equally so is his answer that the failure to pay excise taxes for Rodco was an item that "just got missed." (Tr. 154.)

Here the inconsistency in answers given by Wade Mullet during his testimony comes into play. Mr. Mullet was asked if he first found out that Rodco did not pay its taxes when he was so advised by the IRS. His answer was repeatedly given in the negative. (Tr. 155.) However, this testimony was contradicted by his earlier testimony at a deposition. In addition, in his early answers to counsel in deposition and to the IRS investigator, Mr. Cappazuelle, Mr. Mullet advanced two reasons concerning why the tax was not paid: First, it was said to have been overlooked in the transition of the company to ownership by Holmes; second, Mr. Mullet asserted that they believed that the tax was not owed because Rodco mined its product under an Ohio All Mineral permit.[13] At least one other reason—that Mr. Mullet was somehow following Rodco's custom of non-filing—can be inferred from his testimony. None of

these reasons were reconciled in the mind of the court and none convince the court that the nonpayment was believed to be unnecessary or was forgotten by Rodco.[14]

Moreover, it must be remembered that during the time period in question, Holmes and the other Plaintiffs embarked on a somewhat innovative method of dealing with the payment of excise taxes (which, indeed, is the subject of much of this opinion). The directors of these companies and even Mr. Shaw contemplated whether they should be paying excise taxes on the total weight of their ROM coal product, or whether they should reduce that weight so as to account for the impurities found therein. This scrutiny of the federal excise tax leads the court to at least two conclusions: First, the companies, including Rodco, were run by businessmen who, at least by 1981, had achieved some level of sophistication—the type of men who would not inadvertently overlook a failure of one of their companies to file or pay federal excise taxes; Second, that when the directors of the Plaintiff companies made the decision to pay the excise tax solely on their reduced vision of "coal," they were certainly aware of Rodco's complete failure to ever file for or pay the federal excise tax. It is found as fact that the excise taxes of Rodco were not paid from 1979–1984; that taxes were due and owing to the IRS in that period, and from the time of Mr. Wade Mullet's employment at Rodco as Secretary and office manager Rodco was aware that the taxes were due and owing. This is not to say that Mr. Mullet or the other officers of Rodco are, as the Government suggests, slick businessmen engaged in sharp practices, but rather the court sees them in this instance as opportunistic. They did not create this opportunity, but they recognized it and took it nonetheless. In short, the Government has proven that Rodco fraudulently underpaid its federal excise taxes in the quarters ending June 30, 1981, September 30, 1981, December 31, 1981, all quarters in 1982, 1983, and the quarters ending March 31, 1984, and June 30,

13. This "belief" has no basis in law or fact.

14. These conclusions are supported not only by a fair review of the evidence and the inconstant statements of Mr. Mullet, but also by this court's judgment of his credibility—how the testimony

was given. While the court did not find his testimony to be wholly untruthful, it was confused and unworthy of sustaining belief concerning this issue.

1984. For these quarters, judgment is for the Government.

The court is not convinced, however, that Rodco intended to evade taxes in the period before Holmes took complete ownership of Rodco, that is, before Mr. Mullet took over as Secretary for Rodco in April of 1981. It is clear to the court that the company's President, at that time Mr. Downend, did not know the tax was due. While some of the directors of Rodco were obviously aware of the federal excise tax at the time Holmes took part ownership of Rodco in 1979, it has not been demonstrated that they were aware of Rodco's nonpayment of the tax during this interim period. Granted, the unique financial reporting forms provided to Mr. Downend by Mr. Shaw (which fail to provide a space in which to report the federal excise tax) raise questions as to whether the directors were trying to maintain deliberate ignorance of Rodco's excise tax situation, but these are merely questions the answers to which were not provided at trial. The court finds that the excise taxes due and owing in all quarters ending in 1979 and 1980, and the quarter ending on March 31, 1981 were not withheld due to an intent to evade the payment of taxes. Thus, on the Government's charge of fraud during these quarters, judgment is for Plaintiff Rodco.

## Conclusion

Because the Plaintiffs have established by clear and convincing evidence that they have standing to assert the instant claims for refund, and because they have further established that they are entitled to a refund in an amount corresponding to the demonstrated level of excess moisture found in their ROM coal product, judgment is for Plaintiffs on their claims for refund in an amount equal to 3% of the total weight of ROM coal sold and assessed in the relevant time period.

Furthermore, because the Government has demonstrated by clear and convincing evidence that Plaintiff Rodco intentionally failed to file its federal excise tax returns or pay those same obligations for the quarters ending June 30, 1981, September 30, 1981, December 31, 1981, all quarters in 1982 and 1983, and the quarters ending March 31, 1984, and June 30, 1984, judgment is for the Government on the IRS's assessment of fraud penalties as to those quarters. Judgment is for Plaintiff Rodco as to all quarters ending in 1979 and 1980, and the quarter ending on March 31, 1981.

Within ten days from the issuance of this order, the parties are to submit to the court a stipulated filing which denotes the dollar value of these judgments.

IT IS SO ORDERED.