NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1291n.06

No. 10-1934

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Dec 17, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: BATCHELDER, Chief Judge; GIBBONS and ROGERS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Ford Motor Company ("Ford") seeks approximately $445 million in interest that it believes has accrued on overpayments of its corporate income taxes. Ford contends that the Internal Revenue Service ("IRS"), under 26 U.S.C. § 6611, was required to calculate overpayment interest from the earlier dates on which Ford submitted deposits to the IRS, rather than from the later dates on which Ford requested that those deposits be converted into advance payments of tax. The district court granted the government's motion for judgment on the pleadings and denied Ford's motion for summary judgment, finding reasonable the government's interpretation of § 6611—that overpayment interest be calculated only from the later dates of conversion. For the reasons that follow, we affirm.

-1-

**I.**

The facts giving rise to Ford's legal claims are not in dispute. On September 9 and 27, 1991, July 6, 1992, and June 23, 1994, Ford submitted remittances to the IRS. In submitting these remittances, Ford specifically requested that they be treated as deposits in the nature of a cash bond. Ford made these remittances, amounting to several hundred millions of dollars, after it had been audited by and received 30-day letters from the IRS which notified Ford of proposed tax deficiencies incurred during 1983–1989, 1992, and 1994.

Subsequently, Ford requested that the IRS treat these remittances as advance payments—*i.e.*, payments towards proposed (not yet assessed) tax deficiencies—rather than as deposits in the nature of a cash bond. On December 19, 1994, Ford requested that part of the September 9, 1991 deposit be treated as an advance payment. One year later, on December 15, 1995, Ford requested that another portion of its September 9, 1991 deposit; portions of its deposits made on September 27, 1991 and July 6, 1992; and the entire June 23, 1994 deposit also be treated as advance payments. The IRS obliged, and thus Ford effectively converted its deposits that were held in the nature of cash bonds into advance payments towards proposed past-due taxes.

At some point after the deposits were converted, the IRS determined that Ford had in fact *overpaid* its taxes for the years in question and issued refunds to Ford. These refunds included the amount that Ford overpaid and the interest that had accrued on its overpayment. Importantly—and at the heart of this dispute— the IRS calculated the amount of overpayment interest from the dates on which Ford requested that its deposits be converted to advance payments (*i.e.*, the "conversion dates" of December 19, 1994 and December 15, 1995), not from the earlier dates on which Ford

remitted the deposits (*i.e.*, the "remittance dates" of September 9 and 27, 1991, July 6, 1992, and June 23, 1994).

On July 10, 2008, Ford filed a complaint seeking approximately $445 million in interest that had allegedly accrued on overpayments of its corporate income taxes for 1983–1989, 1992, and 1994. The United States moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Ford responded and also moved for summary judgment. On June 3, 2010, after conducting a hearing, the district court granted the government's motion for judgment on the pleadings and denied Ford's motion for summary judgment. Although the district court conceded that Ford's argument "may have some merit," it found reasonable the government's position that there could be no overpayment of tax—and therefore no overpayment interest accrual—until Ford actually converted its deposits to advance payments. Thus, the court held that the government had correctly calculated Ford's overpayment interest.

We review *de novo* the district court's grant of judgment on the pleadings and its denial of summary judgment. *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 310 (6th Cir. 2010).

**II.**

Corporate tax returns, like individual tax returns, are subject to audit by the IRS. *See generally* 34 Am. Jur. 2d Federal Taxation ¶ 70000 (updated 2012). An audit may reveal that the corporate taxpayer has underpaid or overpaid its taxes for the year in question. If the audit reveals that a taxpayer has overpaid its taxes, then the taxpayer is entitled to the amount of the overpayment, plus interest on that overpayment. 26 U.S.C. § 6611(a); *see generally* 34 Am. Jur. 2d Federal

*Ford Motor Company v. United States*
No. 10-1934

Taxation ¶ 70901 (updated 2012). The "overpayment interest" statute, 26 U.S.C. § 6611, reads as

follows:

> **(a) Rate.** – Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the overpayment rate established under section 6621.
>
> **(b) Period.** – *Such interest shall be allowed and paid* as follows . . .
>> **(2) Refunds.** – In the case of a refund, *from the date of the overpayment* to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days, whether or not such refund check is accepted by the taxpayer after tender of such check to the taxpayer . . . .

26 U.S.C. § 6611(a)–(b)(2) (emphases added). Conversely, if a taxpayer has underpaid taxes, he is

liable for the amount of underpayment plus interest on that underpayment. The "underpayment

interest" statute, 26 U.S.C. § 6601, reads as follows:

> **(a) General rule.** – *If any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment*, interest on such amount at the underpayment rate established under section 6621 *shall be paid for the period from such last date to the date paid*.

*Id.* § 6601(a) (emphases added). Thus, § 6611 (taxpayer entitlement to overpayment interest) and

§ 6601 (taxpayer liability for underpayment interest) are functionally parallel in that they describe

when interest starts and stops accruing.

Because it can take years for the IRS to complete an audit and resolve any administrative

appeals related to a return, significant underpayment interest can accrue in the interim if a taxpayer

has indeed underpaid. To avoid this possibility, a taxpayer may remit money to the IRS pursuant to

Revenue Procedure 84-58—before any tax liability is assessed—which will stop the accrual of

underpayment interest in the event that the taxpayer is later found to have underpaid. *See* Rev. Proc.

84-58, 1984-2 C.B. 501, *superseded by* Rev. Proc. 2005-18, 2005-1 C.B. 798. To gain this benefit

and stop potential underpayment interest from accruing, a taxpayer must designate the remittance

as "a deposit in the nature of a cash bond." *Id.* §§ 4.02; 5.01. A taxpayer who submits a deposit in

the nature of a cash bond may request the return of the deposit at any time—but if he does so, he will

not be paid interest for the time the IRS had the deposit *and* he will be liable for interest incurred on

any underpayment from the date of the remittance. In other words, in addition to not earning interest

on his deposit, the taxpayer who requests his deposit's return will lose whatever interest-stopping

benefits he gained by submitting a deposit in the first place. *See id.* §§ 5.01, 5.04. Alternatively,

after submitting a deposit in the nature of a cash bond, the taxpayer may request that this deposit be

converted and applied towards an advance payment of a tax—*i.e.*, a tax that has been proposed but

not assessed.[1]

There is no dispute Ford designated that its remittances be treated as deposits in the nature

of a cash bond pursuant to Revenue Procedure 84-58, and thus stopped the accrual of any

underpayment interest. Instead, the dispute here involves overpayment interest. Years after Ford

submitted remittances pursuant to Revenue Procedure 84-58, Ford requested that the IRS treat these

deposits as advance payments on its proposed tax liabilities. But then, years after converting Ford's

deposits to tax payments, the IRS recognized that Ford had in fact overpaid its taxes. The IRS

---

[1]It appears that there is no provision of the Revenue Procedures that specifically allows a taxpayer to request the "conversion" of its deposit to a payment of tax. But the fact that a taxpayer can request initially that its remittance be treated as a deposit, *see* Rev. Proc. 84-58 § 4.02, or otherwise it will be treated as a tax payment, *id.* § 4.03, supports the logical inference that a taxpayer may request conversion from deposit to tax payment. And it is undisputed that Ford's request to convert its deposits was granted.

therefore refunded Ford the amount of overpayment plus interest on that overpayment, calculating the interest due from the date that Ford requested that its remittances be treated as tax payments. Ford contends that interest should be calculated from earlier dates—the dates on which it initially submitted its remittances. Accordingly, we face the following question: does overpayment interest accrue from the date of the initial remittance or the date when the taxpayer requests the remittance be treated as an advance tax payment?

### III.

We begin any statutory-interpretation analysis "by examining the language of the statute itself to determine if its meaning is plain." *Nat'l Air Traffic Controllers Ass'n v. Dep't of Transp.*, 654 F.3d 654, 657 (6th Cir. 2011) (internal quotation marks omitted). "Plain meaning is examined by looking at the language and design of the statute as a whole." *Id.* (internal quotation marks omitted). "[W]e must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998) (internal quotation marks omitted). Moreover, "[i]n interpreting the meaning of the words in a revenue Act, we look to the ordinary, everyday senses of the words." *C.I.R. v. Soliman*, 506 U.S. 168, 174 (1993) (internal quotation marks omitted).

In addition, when interpreting § 6611, we bear foremost in mind that Ford's challenge involves construing a waiver of sovereign immunity in a suit for interest against the government. It is well established that the "no-interest rule" shields the government from liability in suits for interest unless there is a express statutory waiver of sovereign immunity. *Library of Cong. v. Shaw*,

478 U.S. 310, 317–18 (1986), *abrogated by statute on other grounds as recognized in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994); *Van Winkle v. McLucas*, 537 F.2d 246, 247–48 (6th Cir. 1976); *United States ex rel. Angarica de la Rua v. Bayard*, 127 U.S. 251, 260 (1888). Where the government has waived sovereign immunity, we are bound to "strictly construe[]" the waiver, "in terms of its scope, in favor of the sovereign," *Lane v. Pena*, 518 U.S. 187, 192 (1996); to limit such waivers to their plain language, *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 693–94 (1983); and to construe any "ambiguities in favor of immunity." *United States v. Williams*, 514 U.S. 527, 531 (1995). Although this strict construction principle does not displace other rules of statutory construction, *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 589 (2008), it is not to be taken lightly: the "no-interest rule provides an added gloss of strictness upon the[] usual rules" governing waivers of sovereign immunity. *Shaw*, 478 U.S. at 318.

Here, the question is not whether Congress has consented to be sued for interest on tax overpayments; it clearly has. Both § 6611(a) and (b) specifically state that overpayment interest "shall be allowed and paid." 26 U.S.C. § 6611(a) ("Interest shall be allowed and paid upon any overpayment . . . ."); *id.* § 6611(b) ("Such interest shall be allowed and paid as follows . . . ."). Rather, the proper question is the scope of that waiver.[2] And as the Supreme Court has recently reiterated, "[f]or the same reason that we refuse to enforce a waiver that is not unambiguously

---

[2]This dispute does not involve the mere calculation of interest, where principles of sovereign immunity arguably might not apply. *See J.F. Shea Co. v. United States*, 754 F.2d 338, 340 (Fed. Cir. 1985). Rather, it involves whether the government can be sued *at all* for overpayment interest accruing from the date of deposit—and therefore necessitates an inquiry into how broadly the government has waived its sovereign immunity, which is fundamentally a question of scope.

expressed in the statute, we also construe any ambiguities in the scope of a waiver in favor of the

sovereign." *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1448 (2012). Thus, for Ford to prevail here, "the

scope of Congress' waiver [must] be clearly discernable from the statutory text in light of traditional

interpretive tools. If it is not, then we take the interpretation most favorable to the Government."

*Id.*[3]

## A.

Section 6611 does not define "the date of overpayment" and the tax code generally does not

define the term "overpayment." *Gen. Elec. Co. & Subsidiaries v. United States*, 384 F.3d 1307, 1312

(Fed. Cir. 2004). However, the Supreme Court has "read the word 'overpayment' in its usual sense,

as meaning any payment in excess of that which is properly due." *Jones v. Liberty Glass Co.*, 332

U.S. 524, 531 (1947); *see United States v. Dalm*, 494 U.S. 596, 609 n. 6 (1990) ("The commonsense

interpretation is that a tax is overpaid when a taxpayer pays more than is owed, for whatever reason

---

[3]Although the Supreme Court has arguably softened its use of the strict construction principle since the 1990s, *see generally Burch v. Sec'y of Health & Human Servs.*, No. 99-946V, 2010 WL 1676767, at *5–6 (Fed. Cl. Apr. 9, 2010), the Court has done so only when a party sought to apply the strict construction principle to a statute or section of a statute entirely separate from the one that supplied the waiver of sovereign immunity itself. *See Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008) (refusing to apply strict construction principle to substantive provision of subsection where the waiver of sovereign immunity was contained in another subsection); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472–473 (2003) (holding that where one statute provides for a waiver of sovereign immunity to enforce a separate statute, the latter statute is not subject to the strict construction principle). Here, § 6611 itself waives sovereign immunity for interest on tax overpayments, and both § 6611(a) and (b) specifically state that overpayment interest "shall be allowed and paid" and contain the key word "overpayment." Thus, the strict construction principle applies. *See Schortmann v. United States*, 82 Fed. Cl. 1, 6 (2008) (finding that the language of § 6611 *as a whole* constituted a waiver of sovereign immunity "too explicit to be misunderstood").

or no reason at all."). But to define "overpayment" with any precision also requires defining "payment." And the ordinary, commonsense meaning of "payment" is "the act of paying or giving compensation: the discharge of a debt or an obligation." Webster's Third New International Dictionary 1659 (1981); Black's Law Dictionary (9th ed. 2009) (defining payment as "[p]erformance of an obligation by the delivery of money . . . accepted in partial or full discharge of the obligation"); *see Katkin v. C.I.R.*, 570 F.2d 139, 142 (6th Cir. 1978) (referring to Webster's and Black's dictionaries in interpreting meaning of "payment" in an unrelated provision of the tax code). Indeed, when interpreting the statutory predecessor to § 6611, one of our sister circuits adopted exactly this definition of "payment." *Busser v. United States*, 130 F.2d 537, 539 (3d Cir. 1942).

The government seizes upon the plain meaning of the word "payment," arguing that there can be no overpayment until there has actually been a payment—and there was no payment until Ford requested that its deposits be converted into tax payments. Prior to that point, Ford's remittances were, at its own request, treated as deposits in the nature of a cash bond and Ford could have requested their return at any time. As Revenue Procedure 84-58 § 2.03 clearly states, "[a] deposit in the nature of a cash bond is not a payment of tax." Accordingly, the government argues that it does not owe Ford interest from the date of the original remittances because they were indisputably made only as deposits, not as payments of any tax obligation.

Ford counters that the "most appropriate starting point" is not § 6611, but rather § 6601, the provision that governs *underpayment* interest. First, Ford contends that these two sections should be interpreted symmetrically because they both use very similar language, *compare* § 6601 ("date paid"), *with* § 6611 ("date of the overpayment"), and both deal with the accrual of interest on tax

payments. Second, Ford notes that under § 6601(a), only a "payment" stops the accrual of underpayment interest against a taxpayer, and since a deposit in the form of a cash bond stops the accrual of interest from the date it is remitted, Rev. Proc. 84-58 § 5.01, that deposit must be considered a payment under § 6601(a). And because a deposit is treated as a payment for underpayment interest purposes under § 6601, it should also be considered a payment for overpayment interest purposes under § 6611. In other words, if a mere deposit *stops* the accrual of underpayment interest, then a mere deposit must also *start* the accrual of overpayment interest.

Both parties' readings are plausible. The government's interpretation is grounded in the ordinary meaning of the terms "date of the overpayment" and "payment." However, this interpretation ignores that the date of remittance is treated as the date of "payment" under § 6601—a section that uses similar language to § 6611—at least insofar as it stops the accrual of underpayment interest pursuant to Revenue Procedure 84-58. Conversely, Ford makes a strong case for interpreting interest accrual under § 6601 and § 6611 symmetrically. Yet Ford ignores a natural reading of "date of overpayment," and does not account for the fact that the language the two statutes employ, though similar, is not identical.[4]

---

[4]Additionally, Ford observes that if the government is correct that a payment only occurs when a deposit is converted to discharge a debt, then the government has unlawfully neglected to collect underpayment interest from remitting taxpayers (who later convert their remittances into payments) for the period from remittance to conversion. This is so, Ford argues, because the IRS must collect interest owed by taxpayers. *See* 26 U.S.C. § 6404(e) (establishing circumstances, not applicable here, under which the IRS can abate interest collection). Ford thus insists that we must either adopt its definition of "payment," or find that the IRS has long been violating the interest statutes.

We do not view the issue in such stark terms. Congress has explained that prior to amending the tax code in 2004, the law of the land was that "[a] deposit in the nature of a cash bond is not a

In light of the parties' conflicting, plausible readings of § 6611, we find that the text of the statute is ambiguous as to when the accrual of overpayment interest begins.

**B.**

Because each of the parties' interpretations of § 6611 is plausible, it cannot be said that Congress has "unequivocally expressed" its waiver of sovereign immunity for claims to overpayment interest accruing between the date a deposit in the nature of a cash bond was remitted and the date that deposit was converted to an advance tax payment. *See United States v. King*, 395 U.S. 1, 4 (1969); *see also United States v. Nordic Vill., Inc.*, 503 U.S. 30, 37 (1992) (finding government's "plausible" statutory interpretation was "enough to establish that a reading imposing monetary liability on the Government [was] not 'unambiguous' and therefore should not be adopted"); *Siddiqui v. United States*, 359 F.3d 1200, 1204 (9th Cir. 2004) (declining to find that Congress had waived sovereign immunity for punitive damages where statute was subject to two "plausible" interpretations); *Fed. Nat'l Mortg. Ass'n v. United States*, 379 F.3d 1303, 1311 (Fed. Cir. 2004) (declining to find that Congress had waived sovereign immunity for overpayment interest where "the language at issue [was] ambiguous, subject to two conflicting interpretations").

---

payment of tax . . . ." Staff of the J. Comm. on Taxation, 108th Cong., General Explanation of Tax Legislation Enacted in the 108th Congress, Part Seventeen: American Jobs Creation Act of 2004, at 60 (Comm. Print 2005). That the IRS has long *treated* deposits as payments for underpayment interest purposes under § 6601—a practice which benefits taxpayers, which Congress has long tolerated, and which is neither expressly prescribed nor proscribed by the statutes—does not necessarily mean that these deposits are "payments" under the interest statutes. Thus, even if we assume that the two interest statutes should be interpreted symmetrically, Ford's interpretation of § 6611 does not necessarily prevail.

Indeed, when we have found a waiver of sovereign immunity in the tax context, Supreme Court precedent interpreting the specific provision at issue has guided our interpretation. In *E.W. Scripps Co. & Subsidiaries v. United States*, 420 F.3d 589, 596–98 (6th Cir. 2005), we concluded that Congress had waived the government's sovereign immunity and was subject to district court jurisdiction with respect to suits for overpayment interest under 28 U.S.C. § 1346(a)(1), a different provision than the one at issue here. We found that language in § 1346(a)(1), which allowed taxpayers to recover "*any sum* alleged to have been excessive or in any manner wrongfully collected," represented a waiver of sovereign immunity. *Id.* at 596 (emphasis added). In finding that the scope of "any sum" under § 1346(a)(1) extended to interest on tax overpayments, we relied in no small part upon *Flora v. United States*, 362 U.S. 145, 149 (1960), a Supreme Court case that had interpreted the phrase "any sum" in § 1346(a)(1) quite broadly, suggesting that it would include interest on tax overpayments. *E.W. Scripps Co.*, 420 F.3d at 596–97. Although we noted the general principle that "taxpayers should be compensated for the lost time-value of their money when they make overpayments of tax," 420 F.3d at 597, a principle that provides some support to Ford, we only did so *after* grounding our interpretation of "any sum" in Supreme Court jurisprudence. No such strong foothold exists here. In fact, the most relevant Supreme Court case supports, albeit weakly, the government.[5]

---

[5]In *Rosenman v. United States*, 323 U.S. 658, 662–63 (1945), the Court found that the taxpayer remittances in question were deposits rather than payments, thus providing some support for the government's view. However, *Rosenman*'s import is sharply limited because that case involved a statute-of-limitations issue rather than an interest-overpayment issue, and construed a long-defunct tax statute. Thus, as the government conceded at oral argument, *Rosenman*'s statements about taxpayer remittances are dicta. In addition, *Rosenman* held that the remittances in

-12-

Instead, Ford relies heavily on Revenue Procedure 84-58, the only published guidance bearing on the meaning of "date of the overpayment" in § 6611(b)(1). Needless to say, relying upon a Revenue Procedure is quite different from relying upon a Supreme Court decision. A revenue procedure is at most an interpretive aid: it is "well-established that, as a general rule, 'the I.R.S.'s Revenue Procedures are directory not mandatory.'" *Estate of Shapiro v. C.I.R.*, 111 F.3d 1010, 1017 (2d Cir. 1997) (quoting *Estate of Jones v. C.I.R.*, 795 F.2d 566, 571 (6th Cir. 1986)). A revenue procedure does not enjoy the status of a law or regulation and does not bind courts. *Xerox Corp. v. United States*, 41 F.3d 647, 657–58 (Fed. Cir. 1994). Rather, it is a "mere internal procedural guide" that typically does not even bind the IRS itself. *See Shapiro*, 111 F.3d at 1017–18; *see also Riley v. United States*, 118 F.3d 1220, 1222 (8th Cir. 1997). Accordingly, "the 'failure to comply with [a] Revenue [Procedure] . . . is not dispositive . . . .'" *Shapiro*, 111 F.3d at 1017 (quoting *Virginia Educ. Fund v. Comm'r*, 799 F.2d 903, 904 (4th Cir. 1986)).

Two provisions of Revenue Procedure 84-58 are relevant here. The parties agree that under Revenue Procedure 84-58 § 5.01, underpayment interest *stops* accruing on the date that a remittance is submitted to the IRS, regardless of whether the remittance is treated as a payment of tax or a deposit. However, the parties debate the meaning of Revenue Procedure 84-58 § 5.05, which deals with when interest *starts* accruing for the purpose of overpayments. That provision reads:

---

question could not be payments at least partly because no tax had yet been assessed, *see id.* at 662, yet the tax code now explicitly rejects the notion that there can be no payment or accrual of overpayment interest until a tax is actually assessed, 26 U.S.C. § 6401(c)—further limiting *Rosenman*'s relevance here.

> Remittances treated as payments of tax will be treated as any other assessed amount and compound interest will be paid on any overpayment under section 6611 of the Code. In the event that [a] deposit in the nature of a cash bond is posted to a taxpayer's account as a payment of tax pursuant to subparagraph 3 of section 4.02, interest will run on an overpayment later determined to be due only from the date the amount was posted as a payment of tax.

Rev. Proc. 84-58 § 5.05.

In Ford's view, the first sentence of § 5.05 establishes the general rule that overpayment interest will be paid on "[r]emittances treated as payments of tax," whether treated as tax payments when initially remitted or when later converted from deposits to tax payments. The second sentence is an exception to this general rule that states that when a deposit is converted to a tax payment pursuant to § 4.02, a section not applicable here, overpayment interest is determined "only from the date the amount was posted as a payment of tax,"—*i.e.*, the conversion date. Ford explains that because "there would be no need for such an 'exception' if interest can never begin accruing under § 6611 before the conversion date, it follows that the *general rule* must be that interest does accrue from the remittance date on a converted deposit."

In response, the government argues that because Revenue Procedure 84-58 "does not even contemplate" a taxpayer's request to convert a deposit to a tax payment, the only way to understand the conversion itself is as a "constructive return" of the deposit to the taxpayer followed by his immediate re-submission of the deposit as a tax payment. Accordingly, when a taxpayer requests a conversion from deposit to payment, he works an effective return of his deposit, which does not bear interest, Rev. Proc. 84-58 §§ 2.03, 4.02, followed by an immediate resubmission in the form of a tax payment, which bears interest from the date it is submitted. In the government's view, the

first sentence of § 5.05 only applies to remittances that are treated as tax payments *when they are sent to the IRS*. Because Ford rendered its remittances as deposits, not as payments of tax, it is not entitled to interest from the remittance date.

The government's interpretation is strained. Under its reading, whenever a taxpayer requests conversion of a deposit to a tax payment and there is a "constructive return" of this deposit, the taxpayer should lose any interest-stopping protections gained by remitting the deposit in the first place. *See* Rev. Proc. 84-58 §5.01. But this did not occur here: the government did not claim that Ford, in requesting that its deposits be converted to tax payments, lost any interest-stopping benefits or owed any underpayment interest as a result of losing these benefits. Indeed, this approach would seem to undercut the entire purpose behind Revenue Procedure 84-58, which is to "provide[] procedures for taxpayers to make remittances in order to stop the running of interest on deficiencies." Rev. Proc. 84-58 § 1. If a taxpayer loses the interest-stopping benefits of making a deposit by requesting that the deposit be converted to a tax payment, then there is little incentive to make a deposit in the first place. In this sense, the government's interpretation strips away from the Revenue Procedure the very protection it was designed to furnish.[6]

Nonetheless, although Ford's interpretation of Revenue Procedure 84-58 §5.05 is superior to the government's, it is insufficient to render the phrase "date of the overpayment" in 26 U.S.C.

---

[6]Furthermore, it appears that the IRS, in a private letter ruling, has contradicted the interpretation of Revenue Procedure 84-58 it now advances. *See* I.R.S. P.L.R. 8738041 (June 23, 1987). Specifically, the IRS stated that "[b]ecause the Government will have uninterrupted use of [a] remittance, the remittance will not be deemed to be returned upon redesignation as a payment of tax . . . ." *Id.* This statement appears to cut against the government's contention that converted deposits are constructively returned to the taxpayer.

§ 6611(b)(1) unambiguous. After all, the Revenue Procedure states and the parties agree that Ford's remittances were not payments when they were submitted. Rev. Proc. 84-58 § 2.03 ("A deposit in the nature of a cash bond is not a payment of tax . . . ."). Thus, the most Ford can say is that its remittances were *treated* as payments by the IRS pursuant to Revenue Procedure 84-58 § 5.01 for purposes of 26 U.S.C. § 6601, and thus these remittances should be *treated* as payments pursuant to Revenue Procedure 84-58 § 5.05 for purposes of shedding light on the language used in 26 U.S.C. § 6611. In other words, Ford relies heavily upon the Revenue Procedure to support its argument that § 6601 and § 6611 should be read symmetrically. But we are unwilling to place so much weight upon an interpretive aid that binds neither the IRS nor this court. *See Shapiro*, 111 F.3d at 1017–18; *Xerox Corp.*, 41 F.3d at 657–58; *Jones*, 795 F.2d at 571. Revenue Procedure 84-58 is just that—a statement of procedure or guidance issued by the *executive* branch. It is far from an expression of congressional intent as to the scope of a waiver of sovereign-immunity; indeed, it does not even enjoy the status of an agency regulation. *Xerox Corp.*, 41 F.3d at 657. Thus, however helpful to Ford, Revenue Procedure 84-58 is too weak an indicator of statutory meaning to overcome the strict statutory construction principle to which the language of § 6611 is subject. *See Premo v. United States*, 599 F.3d 540, 547 (6th Cir. 2010) ("[I]n analyzing whether Congress has waived the immunity of the United States, we must . . . not enlarge the waiver beyond what the language requires" (internal quotation marks omitted)).

Nor do we find any support for Ford's position in subsequent legislative history. In 2004, Congress enacted 26 U.S.C. § 6603, which provides that, contrary to previous practice, taxpayers who deposit funds with the IRS and then request the return of those funds are entitled to interest in

certain circumstances. *Compare United States v. Domino Sugar Corp*., 349 F.3d 84, 87 n.2 (2d Cir. 2003), *with* § 6603(d). Section 6603 provides for a different—and lower—interest rate for returned deposits, when compared to the general overpayment interest rate applicable to overpayments under § 6611. *Compare* § 6603(d)(4), *and* § 6621(b), *with* § 6611(a), *and* § 6621(a)(1).

Ford contends that since § 6603 allows a taxpayer who requests the return of his deposit to recover interest from the remittance date, it makes little sense to interpret § 6611 to allow a taxpayer who converts a deposit—rather than asking for its return—to recover interest only from the conversion date. According to Ford, a taxpayer who requests the return of a deposit would then be entitled to interest from an earlier date than the taxpayer who requests that a deposit be converted, thus illogically rewarding the taxpayer who seeks the return of his deposit over the taxpayer who actually converts his deposit into an advance payment of tax. The government responds that a converted deposit is actually two sequential transactions—a constructive return of the deposit followed by immediate re-submission of that deposit as a tax payment. Under this reasoning, § 6603 requires that the taxpayer be paid interest from the date of deposit to the date of return under the lower § 6603(d)(4) interest rate, and be paid interest from the date of return (which is also the date of resubmission) to the date of refund under the higher § 6621(a)(1) interest rate. In other words, § 6603 allows for the payment of interest at two different rates for a converted deposit, while prior to the enactment of § 6603, interest would only be paid from the date of conversion forward.

Although the government's "constructive return" theory may be a flawed interpretation of Revenue Procedure 84-58, it does make some sense when read in the context of § 6603, which only deals with the accrual of interest on returned deposits. In any event, the passage of § 6603 does not

render the government's interpretation of § 6611 illogical. Thus, subsequent legislative history, which "generally deserves only limited weight," does not alter our analysis here. *See Buck v. Sec'y of Health & Human Serv.*, 923 F.2d 1200, 1207 (6th Cir. 1991).

## IV.

Because the scope of Congress's waiver of sovereign immunity in § 6611 is not "clearly discernable from the statutory text in light of traditional interpretive tools" so as to allow Ford to recover the overpayment interest it seeks here, *see Cooper*, 132 S. Ct. at 1448, we affirm the judgment of the district court.